# Bill of Lading
Multimodal Transport
or Port-to-Port Shipment



www.hamburgsud-line.com

| Shipper | |
|---|---|
| JBS SA/SEARA ALIMENTOS LTDA<br>AV. PALUDO, 155 - INDUSTRIAL,<br>SEARA - SC, 89770-000, BRAZIL.<br><br>C.N.P.J. 02.916.265-0001-60 | **B/L No.** (also to be used as payment ref.): SUDU60ITJ030163A<br>**Booking No.**: 0ITJ030163 |

**Export References**

0627255E20-A
SD.:
Vessel IMO No.: 9526966
INTBL:   TJ60638H         CNPJ-SH: 02916265000160

**Consignee** ("Not negotiable unless consigned to order")
TO ORDER.

**Forwarding Agent-References**

**Notify Party** (See cl. 9)
ZHONGSHAN CITY BENTENGHE WINE
TRADING CO., LTD.
NO.6, WEST 1 STREET, TIANWANG
ROAD, SHAGANG VILLAGE, EAST
DISTRICT, ZHONGSHAN CITY,
GUANGDONG, CHINA.

**Point and country of origin**

**Domestic Routing Instructions / Also Notify / Agent at Port of Discharge**

| Place of Receipt* | Pre-carriage by* | | |
|---|---|---|---|
| **Port of Loading**: ITAJAI, BRITJ | **Ocean Vessel**: MAERSK LEON | **Voyage**: 42E | **Originals to be released at**: ITAJAI, BRITJ   **Freight payable at**: ITAJAI, BRITJ(PAID) |
| **Port of Trans-Shipment***: SHANGHAI PORT, CHINA | **Place of Delivery***: NANSHA NEW PORT, CHINA | | **Mode Load Area**   **Mode Disch. Area** |

**PARTICULARS FURNISHED BY SHIPPER**

| Marks & Nos. | Cont./Seal Nos. | No. of Pkgs. | Description of Goods | Gross Weight | Measurement |
|---|---|---|---|---|---|

```
                            1 - 40' CONTAINER  - SHIPPER'S LOAD, STOW, COUNT, WEIGHT AND SEAL

MNBU3809688            1350 CARTONS OF GRADE A FROZEN CHICKEN PAWS      28965.380 KGS 40.000CBM
Seal-Numbers                35G-45G PER PIECE, SEARA BRAND
MLBR0532669                 PACKED IN 20 KGS STANDARD CARTONS CONTAINING
00076622/490                4 POLYBAGS OF 5KGS EACH. -N.C.M.:0207.14.00
SEARA/HALAL                 NW 27090.400 kgs / GW 28965.380 kgs

Tare: 4300 KG          Cargo stowed in a refrigerated container
Size:40' Type:RH       set at the shipper's requested carrying
Cnt.Ld.:FCLFCL         req. temperature of: -22.00 C.
AS PER SHIPPER.

                       --------------------------------------------------------------------
                       1350 CARTONS                                28965.800 KGS 40.000 CBM
                       --------------------------------------------------------------------

FREIGHT AS PER AGREEMENT              FREIGHT PREPAID BY SHIPPER
RUC:9BR01838723100000000000000627255E20
/
                          Additional export references:
                       9BR01838723100000000000000627255E20

 Agreement No.(s): RSEC9000160-01078

 Page: 1 of  1
```

**COPY not negotiable**

| Tariff Item No. | Total No. of Pkgs. | Declared value (See clause 4.2.(b)) | No. orig. B/L: 3 | SHIPPED ON BOARD: 17.10.20 |
|---|---|---|---|---|

RECEIVED for shipment as specified above in apparent good order and condition unless otherwise stated. The Goods to be delivered at above mentioned Port of Discharge or Place of Delivery, whichever applies, SUBJECT TO Terms and Conditions contained on reverse side hereof, to which Merchant agrees by accepting this Bill of Lading.
IN WITNESS WHEREOF the number of original Bills of Lading stated on this side next to this clause have been signed, one of which being accomplished, the others to stand void, unless compulsorily applicable law provides otherwise.
*Applicable only when used for MULTIMODAL TRANSPORTATION.

**Place and date of issue**
ITAJAI SC BR
19.10.20

**Signed** as Agent for
HAMBURG SÜD

as CARRIER   Alianca Navegacao e Logistica Ltda.

TERMS AND CONDITIONS FOR CARRIAGE
Case 1:20-cv-03495-RCL   Document 1-4   Filed 12/01/20   Page 2 of 12
www.hamburgsud-line.com

## 1. DEFINITIONS
"Carrier" means Hamburg Südamerikanische Dampfschiffahrts-Gesellschaft A/S & Co KG, Willy-Brandt-Straße 59-65, 20457 Hamburg, Germany,Commercial Register: Amtsgericht Hamburg HRA 58448 (hereinafter "Hamburg Süd"), General Partner: Hamburg Süd A/S, Copenhagen (Denmark), Centrale Virksomhedsregister (CVR) No. 32345794. Executive Board: Søren Skou (CEO), Board of Directors: Jim Hagemann Snabe (Chairman), Executive Board of Hamburg Südamerikanische Dampfschiffahrts-Gesellschaft A/S & Co KG: Dr. Arnt Vespermann (CEO), Frank Smet (CCO), Jakob Wegge-Larsen (CFO).
"Carriage" means the whole or any part of the operations and services undertaken by Carrier in respect of the Goods covered by this bill of lading whether by water, land, or air.
"Charges" includes freight, deadfreight, demurrage and all expenses and money obligations incurred or payable in accordance with the applicable tariff or this bill of lading.
"COGSA" means the U.S. Carriage of Goods by Sea Act.
"Container" includes any open or closed container, van, trailer, flatbed, flatrack, transportable tank or any similar receptacle whatsoever used to consolidate the Goods and any connected equipment.
"Goods" means the cargo, in whole or part, received from the shipper and any Container not supplied by or on behalf of Carrier.
"Hague Rules" means the International Convention for the Unification of Certain Rules relating to Bills of Lading of 1924 including the Visby Amendment and the 1979 Protocol.
"Merchant" includes the booking party, shipper, consignee, receiver, holder of this bill of lading, or any person owning or entitled to possession of the Goods or of this bill of lading, and the servants and agents and principals of any of these, all of whom shall be jointly and severally liable to Carrier for the payment of all Charges, and for the performance of the obligations of any of them under this bill of lading.
"Subcontractor" includes the owners, managers, charterers, slot or space charterers, and operators of any Vessel (other than Carrier); underlying or substitute carriers; stevedores and terminal operators; and any direct or indirect servant, agent, or subcontractor (including their own subcontractors), or any other party employed by or on behalf of Carrier, or whose services or equipment have been used to perform this contract whether in contractual privity with Carrier or not.
"Vessel" means the ocean vessel named on the face side hereof, and any substitute vessel, feedership, barge or other means of conveyance by water used for the Carriage.
"VGM" means the verified gross mass obtained by a method prescribed by SOLAS and any laws in force at the port of loading

## 2. CARRIER'S TARIFF(S)
All terms and conditions of Carrier's applicable tariff(s), including but not limited to those pertaining to demurrage and detention are incorporated herein. Copies of the tariff(s) or relevant provisions thereof are obtainable from Carrier or the applicable regulatory body on request. In the event of a conflict between the terms and conditions of such tariff(s) and this bill of lading, the bill of lading shall prevail.

## 3. CHARGES
3.1 Charges shall be deemed earned on acceptance of Goods or Containers or other packages for shipment by Carrier and shall be paid by Merchant in full, without any offset, counterclaim or deduction, Goods and/or Vessel or other conveyance lost or not lost, and shall be non-returnable in any event.
3.2 Merchant shall remain responsible for all Charges, regardless whether the bill of lading have been marked, in words or symbols, "Prepaid", or "Collect".
3.3 In case of non-payment of Charges or any other amount(s) due under this contract, Carrier is entitled to pursue the relevant amount(s) against Merchant or Goods and Merchant shall also be liable for interest on any overdue amount(s) as well as Carrier's reasonable attorney's fees and expenses incurred in collecting any amount(s) due.
3.4 In arranging for any services with respect to Goods, Carrier shall be considered Merchant's agent for all purposes. Charges and payment of Charges to parties other than Carrier shall not, in any event, be considered payment to Carrier.
3.5 Charges for cold treatment are for administration only and do not impose any responsibility on Carrier for completion or success of cold treatment as per the applicable regulations.

## 4. CARRIER'S RESPONSIBILITY
4.1 Except as otherwise noted herein, Carrier shall be responsible for loss of or damage to Goods under the following circumstances only:
(a) PORT-TO-PORT SHIPMENT
(1) When Goods have been lost or damaged from the time of loading on the Vessel until the time of discharge from the Vessel, Carrier's responsibility is governed by German law making the Hague-Rules compulsorily applicable. However, if the bill of lading covers a shipment to or from the USA, COGSA governs Carrier's responsibility and shall apply during the time from loading the Goods on the Vessel until discharge as well as during all times before loading and after discharge of the Goods from the Vessel.
(2) Carrier shall not be responsible for any fault of its personnel and of the Vessel's crew in cases of damage or loss caused by fire or explosion on board the Vessel ("Fire"), or caused by the navigation or management of the Vessel save for damage or loss caused when executing measures which were predominantly taken in the interest of the Goods ("Error in Navigation").
(3) Carrier shall not be responsible for any fault of other persons involved in the navigation or management of the Vessel, in particular, a pilot on board of the Vessel or the Crew of a tug boat assisting the Vessel, in cases of damage or loss caused by the navigation or the management of the Vessel, except for damage or loss caused, when executing measures, which were predominantly taken in the interest of the Goods ("Error in Navigation").
(4) Carrier is not deemed to have custody of the Goods before loading and after discharge, and Carrier is not responsible for acts or omissions of a terminal operator to which the Goods were submitted either by Carrier or by Merchant.
(b) MULTIMODAL TRANSPORT
(1) If it is established that loss or damage to Goods occurred during the port-to-port leg, Carrier's responsibility is governed by clause 4.1(a) and if it is established that loss or damage to Goods occurred during any other leg, the law applicable to such leg of transport shall apply except that if the bill of lading covers a shipment to or from the USA, COGSA shall apply for all legs of transport. If the law thus applicable is not compulsory Carrier's liability shall never exceed 2 Special Drawing Rights ("SDR") per kilo of gross weight of Goods lost or damaged.
(2) If it is not established during which leg of transport loss of or damage to Goods has occurred, Carrier's liability shall be determined in accordance with German law incorporating the Hague Rules, except for shipments to or from the USA in which case COGSA shall apply. Unless otherwise provided for herein, in no event shall the liability of Carrier exceed 2 SDR per kilo of gross weight of Goods lost or damaged.
4.2 LIMITATION OF LIABILITY
(a) In no event shall Carrier's liability under or in connection with this bill of lading exceed 2 SDR per kilo of the gross weight of the Goods lost or damaged, except that if COGSA applies, liability shall not exceed US$ 500 per package or per customary freight unit, as the case may be.
(b) The limitations of liability provided herein apply unless the nature and value of the Goods have been declared by Merchant prior to shipment and inserted in the box "Declared value" and extra freight paid if required. In no event shall the limitation amount exceed the declared value and nothing herein shall be construed as a waiver of limitation.
(c) The terms and conditions in Carrier's tariff(s) and herein (including the limitation of liability of US$ 500 per package or per customary freight unit and law and jurisdiction clauses in this bill of lading) shall apply to all multimodal shipments originating in the USA unless Merchant selects full value Carmack liability coverage under 49 U.S.C. § 11706 by notifying Carrier at the time of booking the Goods and prepaying a negotiated Carmack freight rate obtained from Carrier.
4.3 MISCELLANEOUS PROVISIONS
(a) Delay: Carrier does not undertake that Goods or any documents relating thereto will arrive at a particular time at the Port of Discharge or at the Place of Delivery and Carrier shall not under any circumstances whatsoever be liable for any direct, indirect or consequential loss or damage caused by delay, unless such delay was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result. If Carrier nevertheless shall be held legally liable for any loss or damage caused by delay, such liability shall in no event exceed 3 (three) times the freight paid.
(b) Except as provided herein, under no circumstances shall Carrier be liable for any indirect or consequential loss or damage or for any loss of profit or business from any cause whatsoever, unless such loss or damage was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result.
(c) The liberties, rights, defenses, immunities, exemptions, limitations of and exonerations from liability of whatsoever nature, provided in this bill of lading, or under statute, shall apply in any action or proceeding against Carrier whether founded in contract, tort, bailment or otherwise.
(d) Carrier shall, notwithstanding which legislation is applicable hereunder, be entitled to the benefit of Sections 30501 through 30511, Title 46, U.S. Code as may be amended as if the same were expressly set out herein, including but not limited to the Limitation of Liability Act and Fire Statute.
(e) Carrier shall have no liability whatsoever arising out of or in connection with the acts of any person (not employed or instructed by Carrier) who unlawfully, by the use of force or threats of any kind, damages, seizes, or exercises control over the Goods, over any Subcontractor, or over any means of transportation or storage of the Goods.

## 5. SUBCONTRACTING
(a) Carrier shall be entitled to sub-contract on any terms the whole or any part of the Carriage, loading, unloading, storing, warehousing or other handling whatsoever as well as any and all duties whatsoever undertaken by it in relation to the Goods or Containers or in performance of this contract.
(b) No Subcontractor shall in any circumstances be under any liability whatsoever to Merchant for any loss, damage or delay whether arising or resulting directly or indirectly from any act, neglect or default on the Subcontractor's part, and Merchant undertakes that no claim or allegation, whether in contract, bailment, tort or otherwise, shall be made against any Subcontractor seeking to impose any liability whatsoever in connection with this contract. If any such claim or allegation should nevertheless be made, Merchant will indemnify Carrier against all consequences thereof.
(c) Without prejudice to the foregoing, every liberty, exemption, limitation of and exoneration from liability, condition, right, defense and immunity contained herein or available to Carrier including the right to enforce any law or jurisdiction provision contained herein shall also be available to and extend to every Subcontractor and Vessel which shall be entitled to enforce same against Merchant.

## 6. METHODS AND ROUTES OF CARRIAGE
6.1 Carrier may at any time and without notice to Merchant:
(a) Use any means of transport (water, land and/or air) or storage whatsoever;
(b) Transfer the Goods from one conveyance to another including transshipping or carrying them on a Vessel other than the Vessel named on the reverse side hereof or by any other means of transport or conveyance whatsoever;
(c) Sail with or without pilots, proceed by any route, place or port, in its discretion and at any speed and in any order, and omit, proceed to or stay at any place or port whatsoever, whether scheduled or not;
(d) Load and unload the Goods at any place or port (whether or not any such port is named on the reverse side hereof as the port of loading or port of discharge) and store the Goods at any such port or place;
(e) Terminate the transportation and discharge Goods or Containers, and require Merchant to take delivery. Upon Merchant's failure to do so, Carrier can take any measures including devanning, selling, disposing or storing the Goods at risk and expense of Merchant and Goods;
(f) Open any Container to inspect the contents, and if it appears that any part thereof cannot safely or properly be carried, either at all or without incurring additional expense, Carrier may terminate the transportation and/or incur any reasonable additional expenses to continue Carriage at Merchant's risk and expense;
(g) Carry livestock, explosives, munitions, warlike stores, dangerous or hazardous Goods or lawful Goods of any and all kinds; and/or
(h) Comply with any orders, directions or recommendations given by any government or authority.
6.2 The liberties set out in 6.1 above may be invoked by Carrier for any purpose whatsoever and whether or not connected with the Carriage of the Goods, including but not limited to loading or unloading the Goods, bunkering, repairs and/or dry docking of the Vessel. Anything done in accordance with clause 6.1 or any delay arising therefrom (i) shall be deemed within the contractual Carriage and shall not be a deviation and (ii) Carrier shall be entitled to full Charges and any additional freight, storage and all other expenses related thereto incurred by or on behalf of Carrier, all of which shall be due and owing from Merchant, and Carrier shall have a lien on the Goods to secure the same.

## 7. MATTERS AFFECTING PERFORMANCE
If at any time the Carriage (whether commenced or not) is or is likely to be affected by any hindrance, risk, danger, delay, difficulty or disadvantage of any kind and however arising, including but not limited to Acts of God, disruption in labor, war, civil commotion, political unrest, piracy, act of terrorism, and threat thereof, which cannot be avoided by the exercise of reasonable endeavors (and even though the circumstances affecting performance hereunder existed at the time this contract was entered into or when the Goods were received for Carriage), Carrier may, at its sole discretion and without prior notice to Merchant, either:
(1) Carry the Goods to the contracted port of discharge or place of delivery, whichever is applicable, by an alternative route to that indicated on the reverse side hereof or that which is usual for Goods consigned to that port of discharge or place of delivery and shall be entitled to charge such additional freight as Carrier may determine; or
(2) Suspend the Carriage of the Goods and store them ashore or afloat under these terms and conditions and endeavor to forward them as soon as reasonably possible and shall be entitled to such storage costs and additional freight as Carrier may determine; or
(3) abandon the Carriage of the Goods and place them at Merchant's disposal at any place or port which Carrier may deem safe and convenient, whereupon the responsibility of Carrier in respect of such Goods shall cease. Carrier shall nevertheless be entitled to full freight on the Goods received for the Carriage as well as any additional costs and Charges of the Carriage to, and delivery and storage at, such place or port.
Carrier election to use an alternative route or to suspend the Carriage under this clause shall not prejudice Carrier's right to subsequently to abandon the Carriage.

## 8. DECK CARGO
Goods, whether containerized or not, may be carried on or under deck without notice to Merchant and at Carrier's sole option, and Merchant expressly agrees that: (i) Containers carried on deck are considered for all legal purposes to be stowed under deck; (ii) Carrier shall not be required to note, mark or stamp on the bill of lading any statement of such on deck Carriage; (iii) Carriage of Goods on deck not in Container(s) is solely at Merchant's risk; (iv) Carrier is not responsible for any expense, loss, damage or delay to the Goods resulting from Carriage on deck; (v) Carriage of Goods on deck is subject to all terms and conditions of this bill of lading.

## 9. DELIVERY
9.1 Neither Carrier nor any Subcontractors are obliged to inform Merchant or Notify Party of Vessel's estimated or actual date or time of arrival, and if given, such information shall be considered gratuitous.
9.2 Merchant shall take delivery of the Goods within the time provided in Carrier's applicable Tariff(s). If Merchant fails to do so, Carrier may without notice take any reasonable measure at Merchant's sole risk and expense, including devanning, selling, disposing, or storing the Goods. Such measures shall constitute due delivery hereunder and all liability whatsoever of Carrier in respect of the Goods shall cease.
9.3 After discharge of the Goods, Carrier shall not be responsible for any claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses: (i) arising out of the Goods being in the custody of Customs or other authority and/or (ii) in the event the Goods are improperly released or delivered by Customs or other authority to a third party without the consent of Carrier.

## 10. NOTICE OF CLAIM AND TIME TO SUE
If notice of loss, damage or claim is not given at time of discharge/removal of Goods by Merchant or, if not then apparent, within 3 (three) consecutive days thereafter, a presumption of discharge/delivery in good order shall arise. In any event, Carrier shall be discharged from all liability whatsoever in respect of the Goods, including any claims for indemnity or contribution, unless suit is brought within 1 (one) year after their delivery or the date when they should have been delivered, provided however that if a shorter period for commencement of suit applies under applicable law, any liability whatsoever of Carrier shall cease unless suit is brought within such shorter period.

## 11. CARRIER'S LIEN
Carrier shall have a lien on Goods and any Containers and documents relating thereto for all sums due under this contract or any other contract or undertaking to which Merchant was party or otherwise involved, which lien shall also extend to General Average contributions, salvage and cost of recovering such sums, inclusive of attorney fees, and shall survive delivery. Such lien may be enforced by Carrier by public or private sale at expense of and without notice to Merchant.

## 12. MERCHANT'S RESPONSIBILITY
12.1 Merchant warrants that in agreeing to the terms and conditions hereof, he is, or has the authority of, the person owning or entitled to the possession of the Goods and this bill of lading. Merchant further warrants that: (i) the particulars relating to the Goods as set out on the reverse hereof have been checked and that such particulars, and any other particulars furnished by or on behalf of Merchant are adequate and correct, and (ii) it has complied with all statutes, ordinances, regulations and requirements of whatsoever nature relative to the Goods, Containers or other packages, its/their documentation or in any other way relating thereto.
12.2 Merchant acknowledges that carriage of bullion, precious metals or minerals, diamonds, precious or semi-precious stones or coinage, artworks, antiques, jewellery or rare or precious artefacts, documents of value including but not limited to currency notes, bonds, bearer documents, negotiable instruments, bank drafts, checks, or payment orders, is subject to particulars furnished with the booking of the Goods and Carrier's written approval prior to shipment.
12.3 The party booking FCL shipments shall provide the VGM of each Container to the Carrier not later than the VGM-Cut-off-Date in a format pursuant to www.hamburgsud-line.com/howtovgm. Non-compliance herewith will bar the Carrier from loading the Container on the intended Vessel, in which case the Carrier shall be entitled to demurrage, detention and / or storage fees under the applicable Tariff. The booking party shall also be liable to the Carrier for any costs, damages and fees resulting from such non-compliance. Same applies to the shipper and the consignee named overleaf to the extent they are liable under the applicable law.
12.4 When a Container is stuffed by or on behalf of Merchant, such Container shall be deemed shipped as "Shipper's weight, load, stow, count and seal" and Carrier shall not be liable for loss of or damage to the Goods caused by the: (i) manner in which Container has been stuffed; (ii) unsuitability of Goods for Carriage in Containers, or (iii) Merchant's failure to seal the Container at the commencement of Carriage. Merchant agrees Carrier has no reasonable means of checking quantity, weight, condition, identity or existence of contents or manner in which Goods are stuffed, stowed and secured within Container or breakbulk cargo is packaged, or that same is accurate or proper.
12.5 When a Container is supplied by Carrier and has been stuffed by or on behalf of Merchant, Carrier shall not be liable for loss of or damage to the Goods caused by the unsuitability or defective condition of the Container, which would have been apparent upon reasonable inspection by Merchant at or prior to time Container was stuffed. It is the Merchant's obligation to set and/or check that the temperature controls on the container are at the required carrying temperature and to properly set the ventilation / gas level (CO2/O2) settings.
12.6 In absence of a written request to the contrary, Carrier is not under an obligation to provide a Container of any particular type or quality.
12.7 When any Container is owned or leased by Carrier, Merchant shall be liable, at tariff rates, for any delay beyond time allowed for the use of such Container, and for any loss, damage or expense incurred by Carrier as a result of failure to return the Container to Carrier in sound condition and state of cleanliness as when received, even if a condition caused by Goods does not then manifest itself and/or results in loss, damage or expense at a subsequent time. Payment therefor is due upon presentation of written cost estimates.
12.8 Carrier is committed to the concept of supply chain security. Merchant ensures the sealing of all packed Containers immediately after stuffing is completed and before placing them at Carrier's disposal for all destinations. Only high security seals must be used. All seals must meet the specifications for high security seals issued by the International Organization for Standardization under ISO/PAS 17712 and any subsequent amendment or new definition thereof.
12.9 When a Container is supplied by Merchant, Merchant warrants that: (i) the Container complies with CSC, ISO standards and all applicable rules and regulations established by IMO or other competent authorities or bodies, and (ii) the Container(s) meet or exceed applicable stacking weight and racking test load minimums.
12.10 Merchant shall be liable for and shall indemnify, defend and hold Carrier harmless against all claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses arising from any failure of Merchant to comply with the above-mentioned obligations or otherwise provided in this bill of lading or in any way related to the Goods or Container or which results from the acts or omissions of Merchant, its agents or servants or third parties for whom Merchant, its agents or servants are responsible.

## 13. DANGEROUS OR HAZARDOUS GOODS
13.1 No Goods which are or may become dangerous, hazardous, flammable, explosive, noxious or damaging (including radioactive material), or which are or may become liable to damage any person or property whatsoever, regardless of whether such Goods are listed in any international or national code, convention, listing or table, shall be tendered to Carrier for Carriage without its express consent in writing and without distinctly marking the Goods and the Container or other covering on the outside so as to indicate the nature and character of any such Goods and so as to comply with any applicable laws, regulations or requirements. If any such Goods are delivered to Carrier without such written consent and marking, or if in the opinion of Carrier the Goods are or are liable to become of a dangerous, hazardous, flammable, explosive, noxious or damaging nature, the same may at any time or place be unloaded, destroyed, disposed of, abandoned or rendered harmless without compensation to Merchant.
13.2 Merchant undertakes that such Goods are packed in a manner adequate to withstand the risk of Carriage having regard to their nature and in compliance with all laws, regulations or requirements which may be applicable to the Goods or Carriage including IMDG Code, ADR, RID, and CFR.
13.3 Merchant shall indemnify and defend Carrier against all claims, loss, liability, damage, delay, fines, attorney fees, costs, and/or expenses arising from or related to the Carriage of such Goods and/or breach of any of the warranties and obligations provided herein whether or not Merchant was aware of the nature of such Goods.

## 14. REEFER CONTAINERS
Containers with temperature- or atmosphere-controlled apparatus will not be furnished unless expressly contracted for in writing at time of booking and, when furnished, may entail increased Charges. In absence of an express request, it shall be conclusively presumed that use of a dry Container is appropriate for the Goods. Merchant must provide Carrier with desired set-temperature when delivering Containers to Carrier. Carrier shall not be responsible for: (i) the functioning of temperature- or atmosphere-controlled Containers not supplied by Carrier or related companies or (ii) the consequences of the Goods, when placed in any Container, being at a higher temperature than that required for the Carriage (hot stuffing) or (iii) the recording of temperatures in any form. The Carrier does not accept to comply with any governmental program or protocol.
Merchant acknowledges that temperature- or atmosphere-controlled Containers are not designed to freeze down cargo which has not been presented for stuffing at or below its designated carrying temperature or to monitor and control humidity levels, albeit a setting facility exists, in that humidity is influenced by many external factors and Carrier does not guarantee the maintenance of any intended level of humidity inside any Container.
Merchant acknowledges that Goods, which require refrigeration, ventilation or other specialized attention, were not verified by Carrier, when received, as being at the carrying temperature, humidity level or other condition designated by Merchant.

## 15. BOTH-TO-BLAME COLLISION CLAUSE
The Both-to-Blame Collision Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 16. GENERAL AVERAGE
16.1 General Average shall be adjusted, stated and settled according to York-Antwerp Rules 2016. Merchant shall give such cash deposit or other security as Carrier may deem sufficient to cover estimated General Average contribution of Goods before delivery as Carrier requires, or, if not so required, within 3 (three) months of delivery of Goods, whether or not at the time of delivery Merchant had notice of Carrier's lien. Carrier shall be under no obligation to exercise any lien for General Average contribution due from Merchant(s).
16.2 Cargo's contribution in General Average shall be paid even when such Average is result of fault, neglect or error of the Master, pilot, officers or crew. The New Jason Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 17. LAW AND JURISDICTION
Unless otherwise provided herein, any claim, dispute, suit or proceeding arising under or relating to this bill of lading shall be governed by the laws of Germany and subject to the exclusive jurisdiction of the courts of the City of Hamburg, except that at Carrier's sole option, it may commence proceedings against Merchant at any court or tribunal having jurisdiction.

## 18. NON-WAIVER AND SEVERABILITY
18.1 No servant or agent of Carrier shall have the power to waive or vary any of the terms hereof unless such waiver or variation is in writing and is specifically authorized or ratified in writing by an officer or director of Carrier having actual authority to bind Carrier to such waiver or variation.
18.2 Nothing herein shall operate to deprive Carrier of any statutory protection or defense, immunity, exemption, limitation of or exoneration from liability contained in applicable laws.
18.3 The terms and conditions of this bill of lading (including those of the applicable tariff(s)) are separable, and if any part or term is held invalid, such holding shall not affect the validity or enforceability of any other part or term hereof.

# Bill of Lading
## Multimodal Transport or Port-to-Port Shipment

**HAMBURG SÜD**
www.hamburgsud-line.com

**Shipper**
JBS SA/SEARA ALIMENTOS LTDA
AV. PALUDO, 155 - INDUSTRIAL,
SEARA - SC, 89770-000, BRAZIL.
C.N.P.J. 02.916.265-0001-60

**B/L No. (also to be used as payment ref.)**
SUDU60ITJ030163B

**Booking No.**
0ITJ030163

**Export References**
0627255E20-A
SD.:
Vessel IMO No.: 9526966
INTBL:   TJ60638H       CNPJ-SH: 02916265000160

**Consignee** ("Not negotiable unless consigned to order")
TO ORDER.

**Forwarding Agent-References**

**Notify Party** (See cl. 9)
ZHONGSHAN CITY BENTENGHE WINE
TRADING CO., LTD.
NO.6, WEST 1 STREET, TIANWANG
ROAD, SHAGANG VILLAGE, EAST
DISTRICT, ZHONGSHAN CITY,
GUANGDONG, CHINA.

**Point and country of origin**

**Domestic Routing Instructions / Also Notify / Agent at Port of Discharge**

**Place of Receipt**

**Pre-carriage by**

**Port of Loading**
ITAJAI, BRITJ

**Ocean Vessel**
MAERSK LEON

**Voyage**
42E

**Originals to be released at**
ITAJAI, BRITJ

**Freight payable at**
ITAJAI, BRITJ(PAID)

**Port of Trans-Shipment**
SHANGHAI PORT, CHINA

**Place of Delivery**
NANSHA NEW PORT, CHINA

**Mode Load Area**

**Mode Disch. Area**

---

**PARTICULARS FURNISHED BY SHIPPER**

| Marks & Nos. | Cont./Seal Nos. | No. of Pkgs. | Description of Goods | Gross Weight | Measurement |
|---|---|---|---|---|---|
| | | | 1 - 40' CONTAINER  - SHIPPER'S LOAD, STOW, COUNT, WEIGHT AND SEAL | | |
| | MNBU4090285<br>Seal-Numbers<br>MLBR0579992<br>00073579/490<br>SEARA/HALAL | 1350 | CARTONS OF GRADE A FROZEN CHICKEN PAWS<br>35G-45G PER PIECE, SEARA BRAND<br>PACKED IN 20 KGS STANDARD CARTONS CONTAINING<br>4 POLYBAGS OF 5KGS EACH. -N.C.M.:0207.14.00<br>NW 27090.400 kgs / GW 28965.380 kgs | 28965.380 KGS | 40.000CBM |
| | Tare: 4340 KG<br>Size:40' Type:RH<br>Cnt.Ld.:FCLFCL<br>AS PER SHIPPER. | | Cargo stowed in a refrigerated container<br>set at the shipper's requested carrying<br>req. temperature of: -22.00 C. | | |
| | | 1350 CARTONS | | 28965.800 KGS | 40.000 CBM |

FREIGHT AS PER AGREEMENT            FREIGHT PREPAID BY SHIPPER
RUC:9BR01838723100000000000000627255E20
/

                    Additional export references:
                    9BR01838723100000000000000627255E20

Agreement No.(s): RSEC9000160-01078

Page: 1 of  1

**COPY not negotiable**

| Tariff Item No. | Total No. of Pkgs. | Declared value (See clause 4.2.(b)) | No. orig. B/L | |
|---|---|---|---|---|
| | | | 3 | SHIPPED ON BOARD:   17.10.20 |

RECEIVED for shipment as specified above in apparent good order and condition unless otherwise stated. The Goods to be delivered at above mentioned Port of Discharge or Place of Delivery, whichever applies, SUBJECT TO Terms and Conditions contained on reverse side hereof, to which Merchant agrees by accepting this Bill of Lading.
IN WITNESS WHEREOF the number of original Bills of Lading stated on this side next to this clause have been signed, one of which being accomplished, the others to stand void, unless compulsorily applicable law provides otherwise.
*Applicable only when used for MULTIMODAL TRANSPORTATION.



**Place and date of issue**
ITAJAI SC BR
19.10.20

**Signed** as Agent for
HAMBURG SÜD

as CARRIER           Alianca Navegacao e Logistica Ltda.

HS BL 02-20

# TERMS AND CONDITIONS FOR CARRIAGE

www.hamburgsud-line.com

## 1. DEFINITIONS

"Carrier" means Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co KG, Willy-Brandt-Straße 59-65, 20457 Hamburg, Germany,Commercial Register: Amtsgericht Hamburg HRA 59448 (hereinafter "Hamburg Süd"), General Partner: Hamburg Süd A/S, Copenhagen (Denmark), Centrale Virksomhedsregister (CVR) No. 32345794. Executive Board: Søren Skou (CEO), Board of Directors: Jim Hagemann Snabe (Chairman), Executive Board of Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co KG: Dr. Arnt Vespermann (CEO), Frank Smet (CCO), Jakob Wegge-Larsen (CFO).
"Carriage" means the whole or any part of the operations and services undertaken by Carrier in respect of the Goods covered by this bill of lading whether by water, land, or air.
"Charges" includes freight, deadfreight, demurrage and all expenses and money obligations incurred or payable in accordance with the applicable tariff or this bill of lading.
"COGSA" means the U.S. Carriage of Goods by Sea Act.
"Container" includes any open or closed container, van, trailer, flatbed, flatrack, transportable tank or any similar receptacle whatsoever used to consolidate the Goods and any connected equipment.
"Goods" means the cargo, in whole or part, received from the shipper and any Container not supplied by or on behalf of Carrier.
"Hague Rules" means the International Convention for the Unification of Certain Rules relating to Bills of Lading of 1924 including the Visby Amendment and the 1979 Protocol.
"Merchant" includes the booking party, shipper, consignee, receiver, holder of this bill of lading, or any person owning or entitled to possession of the Goods or of this bill of lading, and the servants and agents and principals of any of these, all of whom shall be jointly and severally liable to Carrier for the payment of all Charges, and for the performance of the obligations of any of them under this bill of lading.
"Subcontractor" includes the owners, managers, charterers, slot or space charterers, and operators of any Vessel (other than Carrier); underlying or substitute carriers; stevedores and terminal operators; and any direct or indirect servant, agent, or subcontractor (including their own subcontractors), or any other party employed by or on behalf of Carrier, or whose services or equipment have been used to perform this contract whether in contractual privity with Carrier or not.
"Vessel" means the ocean vessel named on the face side hereof, and any substitute vessel, feedership, barge or other means of conveyance by water used for the Carriage.
"VGM" means the verified gross mass obtained by a method prescribed by SOLAS and any laws in force at the port of loading

## 2. CARRIER'S TARIFF(S)

All terms and conditions of Carrier's applicable tariff(s), including but not limited to those pertaining to demurrage and detention are incorporated herein. Copies of the tariff(s) or relevant provisions thereof are obtainable from Carrier or the applicable regulatory body on request. In the event of a conflict between the terms and conditions of such tariff(s) and this bill of lading, the bill of lading shall prevail.

## 3. CHARGES

3.1 Charges shall be deemed earned on acceptance of Goods or Containers or other packages for shipment by Carrier and shall be paid by Merchant in full, without any offset, counterclaim or deduction, Goods and/or Vessel or other conveyance lost or not lost, and shall be non-returnable in any event.
3.2 Merchant shall remain responsible for all Charges, regardless whether the bill of lading be marked, in words or symbols, "Prepaid", or "Collect".
3.3 In case of non-payment of Charges or any other amount(s) due under this contract, Carrier is entitled to pursue the relevant amount(s) against Merchant or Goods and Merchant shall also be liable for interest on any overdue amount(s) as well as Carrier's reasonable attorney's fees and expenses incurred in collecting any amount(s) due.
3.4 In arranging for any services with respect to Goods, Carrier shall be considered Merchant's agent for all purposes. Charges and payment of Charges to parties other than Carrier shall not, in any event, be considered payment to Carrier.
3.5 Charges for cold treatment are for administration only and do not impose any responsibility on Carrier for completion or success of cold treatment as per the applicable regulations.

## 4. CARRIER'S RESPONSIBILITY

4.1 Except as otherwise noted herein, Carrier shall be responsible for loss of or damage to Goods under the following circumstances only:
(a) PORT-TO-PORT SHIPMENT
(1) When Goods have been lost or damaged from the time of loading on the Vessel until the time of discharge from the Vessel, Carrier's responsibility is governed by German law making the Hague-Rules compulsorily applicable. However, if the bill of lading covers a shipment to or from the USA, COGSA governs Carrier's responsibility and shall apply during the time from loading the Goods on the Vessel until discharge as well as during all times before loading and after discharge of the Goods from the Vessel.
(2) Carrier shall not be responsible for any fault of its personnel and of the Vessel's crew in cases of damage or loss caused by fire or explosion on board the Vessel ("Fire"), or caused by the navigation or management of the Vessel save for damage or loss caused when executing measures which were predominantly taken in the interest of the Goods ("Error in Navigation").
(3) Carrier shall not be responsible for any fault of other persons involved in the navigation or management of the Vessel, in particular, a pilot on board of the Vessel or the Crew of a tug boat assisting the Vessel, in cases of damage or loss caused by the navigation or the management of the Vessel, except for damage or loss caused, when executing measures, which were predominantly taken in the interest of the Goods ("Error in Navigation").
(4) Carrier is not deemed to have custody of the Goods before loading and after discharge, and Carrier is not responsible for acts or omissions of a terminal operator to which the Goods were submitted either by Carrier or by Merchant.
(b) MULTIMODAL TRANSPORT
(1) If it is established that loss or damage to Goods occurred during the port-to-port leg, Carrier's responsibility is governed by clause 4.1(a) and if it is established that loss or damage to Goods occurred during any other leg, the law applicable to such leg of transport shall apply except that if the bill of lading covers a shipment to or from the USA, COGSA shall apply for all legs of transport. If the law thus applicable is not compulsory Carrier's liability shall never exceed 2 Special Drawing Rights ("SDR") per kilo of gross weight of Goods lost or damaged.
(2) If it is not established during which leg of transport loss of or damage to Goods has occurred, Carrier's liability shall be determined in accordance with German law incorporating the Hague Rules, except for shipments to or from the USA in which case COGSA shall apply. Unless otherwise provided for herein, in no event shall the liability of Carrier exceed 2 SDR per kilo of gross weight of Goods lost or damaged.
4.2 LIMITATION OF LIABILITY
(a) In no event shall Carrier's liability under or in connection with this bill of lading exceed 2 SDR per kilo of the gross weight of the Goods lost or damaged, except that if COGSA applies, liability shall not exceed US$ 500 per package or per customary freight unit, as the case may be.
(b) The limitations of liability provided herein apply unless the nature and value of the Goods have been declared by Merchant prior to shipment and inserted in the box "Declared value" and extra freight paid if required. In no event shall the limitation amount exceed the declared value and nothing herein shall be construed as a waiver of limitation.
(c) The terms and conditions in Carrier's tariff(s) and herein (including the limitation of liability of US$ 500 per package or per customary freight unit and law and jurisdiction clauses in this bill of lading) apply to all multimodal shipments originating in the USA unless Merchant selects full value Carmack liability coverage under 49 U.S.C. § 11706 by notifying Carrier at the time of booking the Goods and prepaying a negotiated Carmack freight rate obtained from Carrier.
4.3 MISCELLANEOUS PROVISIONS
(a) Delay: Carrier does not undertake that Goods or any documents relating thereto will arrive at a particular time at the Port of Discharge or at the Place of Delivery and Carrier shall not under any circumstances whatsoever be liable for any direct, indirect or consequential loss or damage caused by delay, unless such delay was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result. If Carrier nevertheless shall be held legally liable for any loss or damage caused by delay, such liability shall in no event exceed 3 (three) times the freight paid.
(b) Except as provided herein, under no circumstances shall Carrier be liable for any indirect or consequential loss or damage or for any loss of profit or business from any cause whatsoever, unless such loss or damage was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result.
(c) The liberties, rights, defenses, immunities, exemptions, limitations of and exonerations from liability of whatsoever nature, provided in this bill of lading, or under statute, shall apply in any action or proceeding against Carrier whether founded in contract, tort, bailment or otherwise.
(d) Carrier shall, notwithstanding which legislation is applicable hereunder, be entitled to the benefit of Sections 30501 through 30511, Title 46, U.S. Code as may be amended as if the same were expressly set out herein, including but not limited to the Limitation of Liability Act and Fire Statute.
(e) Carrier shall have no liability whatsoever arising out of or in connection with the acts of any person (not employed or instructed by Carrier) who unlawfully, by the use of force or threats of any kind, damages, seizes, or exercises control over the Goods, over any Subcontractor, or over any means of transportation or storage of the Goods.

## 5. SUBCONTRACTING

(a) Carrier shall be entitled to sub-contract on any terms the whole or any part of the Carriage, loading, unloading, storing, warehousing or other handling whatsoever as well as any and all duties whatsoever undertaken by it in relation to the Goods or Containers or in performance of this contract.
(b) No Subcontractor shall in any circumstances be under any liability whatsoever to Merchant for any loss, damage or delay whether arising or resulting directly or indirectly from any act, neglect or default on the Subcontractor's part, and Merchant undertakes that no claim or allegation, whether in contract, bailment, tort, or otherwise, shall be made against any Subcontractor seeking to impose any liability whatsoever in connection with this contract. If any such claim or allegation should nevertheless be made, Merchant will indemnify Carrier against all consequences thereof.
(c) Without prejudice to the foregoing, every liberty, exemption, limitation of and exoneration from liability, condition, right, defense and immunity contained herein or available to Carrier including the right to enforce any law or jurisdiction provision contained herein shall also be available to and extend to every Subcontractor and Vessel which shall be entitled to enforce same against Merchant.

## 6. METHODS AND ROUTES OF CARRIAGE

6.1 Carrier may at any time and without notice to Merchant:
(a) Use any means of transport (water, land and/or air) or storage whatsoever;
(b) Transfer the Goods from one conveyance to another including transshipping or carrying them on a Vessel other than the Vessel named on the reverse side hereof or by any other means of transport or conveyance whatsoever;
(c) Sail with or without pilots, proceed by any route, place or port, in its discretion and at any speed and in any order, and omit, proceed to or stay at any place or port whatsoever, whether scheduled or not;
(d) Load and unload the Goods at any place or port (whether or not any such port is named on the reverse side hereof as the port of loading or port of discharge) and store the Goods at any such port or place;
(e) Terminate the transportation and discharge Goods or Containers, and require Merchant to take delivery. Upon Merchant's failure to do so, Carrier can take any measures including devanning, selling, disposing or storing the Goods at risk and expense of Merchant and Goods;
(f) Open any Container to inspect the contents, and if it appears that any part thereof cannot safely or properly be carried, either at all or without incurring additional expense, Carrier may terminate the transportation and/or incur any reasonable additional expenses to continue Carriage at Merchant's risk and expense;
(g) Carry livestock, explosives, munitions, warlike stores, dangerous or hazardous Goods or lawful Goods of any and all kinds; and/or
(h) Comply with any orders, directions or recommendations given by any government or authority.
6.2 The liberties set out in 6.1 above may be invoked by Carrier for any purpose whatsoever and whether or not connected with the Carriage of the Goods, including but not limited to loading or unloading the Goods, bunkering, repairs and/or dry docking of the Vessel. Anything done in accordance with clause 6.1 or any delay arising therefrom (i) shall be deemed within the contractual Carriage and shall not be a deviation and (ii) Carrier shall be entitled to full Charges and any additional freight, storage and all other expenses related thereto incurred by or on behalf of Carrier, all of which shall be due and owing from Merchant, and Carrier shall have a lien on the Goods to secure such payment.

## 7. MATTERS AFFECTING PERFORMANCE

If at any time the Carriage (whether commenced or not) is or is likely to be affected by any hindrance, risk, danger, delay, difficulty or disadvantage of any kind and however arising, including but not limited to Acts of God, disruption in labor, war, civil commotion, political unrest, piracy, act of terrorism, and threat thereof, which cannot be avoided by the exercise of reasonable endeavors (and even though the circumstances affecting performance hereunder existed at the time this contract was entered into or when the Goods were received for Carriage), Carrier may, at its sole discretion and without prior notice to Merchant, either:
(1) Carry the Goods to the contracted port of discharge or place of delivery, whichever is applicable, by an alternative route to that indicated on the reverse side hereof or that which is usual for Goods consigned to that port of discharge or place of delivery and shall be entitled to charge such additional freight as Carrier may determine; or
(2) Suspend the Carriage of the Goods and store them ashore or afloat under these terms and conditions and endeavor to forward them as soon as reasonably possible and shall be entitled to such storage costs and additional freight as Carrier may determine; or
(3) abandon the Carriage of the Goods and place them at Merchant's disposal at any place or port which Carrier may deem safe and convenient, whereupon the responsibility of Carrier in respect of such Goods shall cease. Carrier shall nevertheless be entitled to full freight on the Goods received for the Carriage as well as any additional costs and Charges of the Carriage to, and delivery and storage at, such place or port.
Carrier election to use an alternative route or to suspend the Carriage under this clause shall not prejudice Carrier's right to subsequently to abandon the Carriage.

## 8. DECK CARGO

Goods, whether containerized or not, may be carried on or under deck without notice to Merchant and at Carrier's sole option, and Merchant expressly agrees that: (i) Containers carried on deck are considered for all legal purposes to be stowed under deck; (ii) Carrier shall not be required to note, mark or stamp on the bill of lading any statement of such on deck Carriage; (iii) Carriage of Goods on deck not in Container(s) is solely at Merchant's risk; (iv) Carrier is not responsible for any expense, loss, damage or delay to the Goods resulting from Carriage on deck; (v) Carriage of Goods on deck is subject to all terms and conditions of this bill of lading.

## 9. DELIVERY

9.1 Neither Carrier nor any Subcontractors are obliged to inform Merchant or Notify Party of Vessel's estimated or actual date or time of arrival, and if given, such information shall be considered gratuitous.
9.2 Merchant shall take delivery of the Goods within the time provided in Carrier's applicable Tariff(s). If Merchant fails to do so, Carrier may without notice take any reasonable measure at Merchant's sole risk and expense, including devanning, selling, disposing, or storing the Goods. Such measures shall constitute due delivery hereunder and all liability whatsoever of Carrier in respect of the Goods shall cease.
9.3 After discharge of the Goods, Carrier shall not be responsible for any claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses: (i) arising out of the Goods being in the custody of Customs or other authority and/or (ii) in the event the Goods are improperly released or delivered by Customs or other authority to a third party without the consent of Carrier.

## 10. NOTICE OF CLAIM AND TIME TO SUE

If notice of loss, damage or claim is not given at time of discharge/removal of Goods by Merchant or, if not then apparent, within 3 (three) consecutive days thereafter, a presumption of discharge/delivery in good order shall arise. In any event, Carrier shall be discharged from all liability whatsoever in respect of the Goods, including any claims for indemnity or contribution, unless suit is brought within 1 (one) year after their delivery or the date when they should have been delivered, provided however that if a shorter period for commencement of suit applies under applicable law, any liability whatsoever of Carrier shall cease unless suit is brought within such shorter period.

## 11. CARRIER'S LIEN

Carrier shall have a lien on Goods and any Charges and documents relating thereto for all sums due under this contract or any other contract or undertaking to which Merchant was party or otherwise involved, which lien shall also extend to General Average contributions, salvage and cost of recovering such sums, inclusive of attorney fees, and shall survive delivery. Such lien may be enforced by Carrier by public or private sale at expense of and without notice to Merchant.

## 12. MERCHANT'S RESPONSIBILITY

12.1 Merchant warrants that in agreeing to the terms and conditions hereof, he is, or has the authority of, the person owning or entitled to the possession of the Goods and this bill of lading. Merchant further warrants that: (i) the particulars relating to the Goods as set out on the reverse hereof have been checked and that such particulars, and any other particulars furnished by or on behalf of Merchant are adequate and correct, and (ii) it has complied with all statutes, ordinances, regulations and requirements of whatsoever nature relative to the Goods, Containers or other packages, its/their documentation or in any other way relating thereto.
12.2 Merchant acknowledges that carriage of bullion, precious metals or minerals, diamonds, precious or semi-precious stones or coinage, artworks, antiques, jewellery or rare or precious artefacts, documents of value including but not limited to currency notes, bonds, bearer documents, negotiable instruments, bank drafts, checks, or payment orders, is subject to particulars furnished with the booking of the Goods and Carrier's written approval prior to shipment.
12.3 The party booking FCL shipments shall provide the VGM of each Container to the Carrier not later than the VGM-Cut-off-Date in a format pursuant to www.hamburgsud-line.com/howtovgm. Non-compliance herewith will bar the Carrier from loading the Container on the intended Vessel, in which case the Carrier shall be entitled to demurrage, detention and / or storage fees under the applicable Tariff. The booking party shall also be liable to the Carrier for any costs, damages and fees resulting from such non-compliance. Same applies to the shipper and the consignee named overleaf to the extent they are liable under the applicable law.
12.4 When a Container is stuffed by or on behalf of Merchant, such Container shall be deemed shipped as "Shipper's weight, load, stow, count and seal" and Carrier shall not be liable for loss of or damage to the Goods caused by the: (i) manner in which Container has been stuffed; (ii) unsuitability of Goods for Carriage in Containers, or (iii) Merchant's failure to seal the Container at the commencement of Carriage. Merchant agrees Carrier has no reasonable means of checking quantity, weight, condition, identity or existence of contents or manner in which Goods are stuffed, stowed and secured within Container or breakbulk cargo is packaged, or that same is accurate or proper.
12.5 When a Container is supplied by Carrier and has been stuffed by or on behalf of Merchant, Carrier shall not be liable for loss of or damage to the Goods caused by the unsuitability or defective condition of the Container, which would have been apparent upon reasonable inspection by Merchant at or prior to time Container was stuffed. It is the Merchant's obligation to set and/or check that the temperature controls on the container are at the required carrying temperature and to properly set the ventilation / gas level (CO2/O2) settings.
12.6 In absence of a written request to the contrary, Carrier is not under an obligation to provide a Container of any particular type or quality.
12.7 When any Container is owned or leased by Carrier, Merchant shall be liable, at tariff rates, for any delay beyond time allowed for the use of such Container, and for any loss, damage or expense incurred by Carrier as a result of failure to return the Container to Carrier in sound condition and state of cleanliness as when received, even if a condition caused by Goods does not then manifest itself and/or results in loss, damage or expense at a subsequent time. Payment therefor is due upon presentation of written cost estimates.
12.8 Carrier is committed to the concept of supply chain security. Merchant ensures the sealing of all packed Containers immediately after stuffing is completed and before placing them at Carrier's disposal for all destinations. Only high security seals must be used. All seals must meet the specifications for high security seals issued by the International Organization for Standardization under ISO/PAS 17712 and any subsequent amendment or new definition thereof.
12.9 When a Container is supplied by Merchant, Merchant warrants that: (i) the Container complies with CSC, ISO standards and all applicable rules and regulations established by IMO or other competent authorities or bodies, and (ii) the Container(s) meet or exceed applicable stacking weight and racking test load minimums.
12.10 Merchant shall be liable for and shall indemnify, defend and hold Carrier harmless against all claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses arising from any failure of Merchant to comply with the above-mentioned obligations or otherwise provided in this bill of lading or in any way related to the Goods or Container or which results from the acts or omissions of Merchant, its agents or servants or third parties for whom Merchant, its agents or servants are responsible.

## 13. DANGEROUS OR HAZARDOUS GOODS

13.1 No Goods which are or may become dangerous, hazardous, flammable, explosive, noxious or damaging (including radioactive material), or which are or may become liable to damage any person or property whatsoever, regardless of whether such Goods are listed in any international or national code, convention, listing or table, shall be tendered to Carrier for Carriage without its express consent in writing and without distinctly marking the Goods and the Container or other covering on the outside so as to indicate the nature and character of any such Goods and so as to comply with any applicable laws, regulations or requirements. If any such Goods are delivered to Carrier without such written consent and marking, or if in the opinion of Carrier the Goods are or are liable to become of a dangerous, hazardous, flammable, explosive, noxious or damaging nature, the same may at any time or place be unloaded, destroyed, disposed of, abandoned or rendered harmless without compensation to Merchant.
13.2 Merchant undertakes that such Goods are packed in a manner adequate to withstand the risk of Carriage having regard to their nature and in compliance with all laws, regulations or requirements which may be applicable to the Goods or Carriage including IMDG Code, ADR, RID, and CFR.
13.3 Merchant shall indemnify and defend Carrier against all claims, loss, liability, damage, delay, fines, attorney fees, costs, and/or expenses arising from or related to the Carriage of such Goods and/or breach of any of the warranties and obligations provided herein whether or not Merchant was aware of the nature of such Goods.

## 14. REEFER CONTAINERS

Containers with temperature- or atmosphere-controlled apparatus will not be furnished unless expressly contracted for in writing at time of booking and, when furnished, may entail increased Charges. In absence of an express request, it shall be conclusively presumed that use of a dry Container is appropriate for the Goods. Merchant must provide Carrier with desired set-temperature when delivering Containers to Carrier. Carrier shall not be responsible for: (i) the functioning of temperature- or atmosphere-controlled Containers not supplied by Carrier or related companies or (ii) the consequences of the Goods, when placed in any Container, being at a higher temperature than that required for the Carriage (hot stuffing) or (iii) the recording of temperatures in any form. The Carrier does not accept to comply with any governmental program or protocol.
Merchant acknowledges that temperature- or atmosphere-controlled Containers are not designed to freeze down cargo which has not been presented for stuffing at or below its designated carrying temperature or to monitor and control humidity levels, albeit a setting facility exists, in that humidity is influenced by many external factors and Carrier does not guarantee the maintenance of any intended level of humidity inside any Container.
Merchant acknowledges that Goods, which require refrigeration, ventilation or other specialized attention, were not verified by Carrier, when received, as being at the carrying temperature, humidity level or other condition designated by Merchant.

## 15. BOTH-TO-BLAME COLLISION CLAUSE

The Both-to-Blame Collision Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 16. GENERAL AVERAGE

16.1 General Average shall be adjusted, stated and settled according to York-Antwerp Rules 2016. Merchant shall give such cash deposit or other security as Carrier may deem sufficient to cover estimated General Average contribution of Goods before delivery as Carrier requires, or, if not so required, within 3 (three) months of delivery of Goods, whether or not at the time of delivery Merchant had notice of Carrier's lien. Carrier shall be under no obligation to exercise any lien for General Average contribution due from Merchant(s).
16.2 Cargo's contribution in General Average shall be paid even when such Average is result of fault, neglect or error of the Master, pilot, officers or crew. The New Jason Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 17. LAW AND JURISDICTION

Unless otherwise provided herein, any claim, dispute, suit or proceeding arising under or relating to this bill of lading shall be governed by the laws of Germany and subject to the exclusive jurisdiction of the courts of the City of Hamburg, except that at Carrier's sole option, it may commence proceedings against Merchant at any court or tribunal having jurisdiction.

## 18. NON-WAIVER AND SEVERABILITY

18.1 No servant or agent of Carrier shall have the power to waive or vary any of the terms hereof unless such waiver or variation is in writing and is specifically authorized or ratified in writing by an officer or director of Carrier having actual authority to bind Carrier to such waiver or variation.
18.2 Nothing herein shall operate to deprive Carrier of any statutory protection or defense, immunity, exemption, limitation of or exoneration from liability contained in applicable laws.
18.3 The terms and conditions of this bill of lading (including those of the applicable tariff(s)) are separable, and if any part or term is held invalid, such holding shall not affect the validity or enforceability of any other part or term hereof.

HS BL 01-19 - 742383

# Bill of Lading
## Multimodal Transport or Port-to-Port Shipment

 HAMBURG SÜD

www.hamburgsud-line.com

**Shipper**
JBS SA/SEARA ALIMENTOS LTDA
AV. PALUDO, 155 - INDUSTRIAL,
SEARA - SC, 89770-000, BRAZIL.

C.N.P.J. 02.916.265-0001-60

**B/L No. (also to be used as payment ref.)**: SUDU60ITJ030163C
**Booking No.**: 0ITJ030163

**Export References**
0627255E20-A
SD.:
Vessel IMO No.: 9526966
INTBL: TJ60638H   CNPJ-SH: 02916265000160

**Consignee** ("Not negotiable unless consigned to order")
TO ORDER.

**Notify Party** (See cl. 9)
ZHONGSHAN CITY BENTENGHE WINE TRADING CO., LTD.
NO.6, WEST 1 STREET, TIANWANG ROAD, SHAGANG VILLAGE, EAST DISTRICT, ZHONGSHAN CITY, GUANGDONG, CHINA.

**Forwarding Agent-References**

**Point and country of origin**

**Domestic Routing Instructions / Also Notify / Agent at Port of Discharge**

**Place of Receipt***
**Pre-carriage by***

**Port of Loading**: ITAJAI, BRITJ
**Ocean Vessel**: MAERSK LEON   **Voyage**: 42E
**Originals to be released at**: ITAJAI, BRITJ
**Freight payable at**: ITAJAI, BRITJ(PAID)

**Port of Trans-Shipment***: SHANGHAI PORT, CHINA
**Place of Delivery***: NANSHA NEW PORT, CHINA
**Mode Load Area**
**Mode Disch. Area**

### PARTICULARS FURNISHED BY SHIPPER

| Marks & Nos. | Cont./Seal Nos. | No. of Pkgs. | Description of Goods | Gross Weight | Measurement |
|---|---|---|---|---|---|

1 - 40' CONTAINER   - SHIPPER'S LOAD, STOW, COUNT, WEIGHT AND SEAL

```
MNBU3971169         1350 CARTONS OF GRADE A FROZEN CHICKEN PAWS    28965.380 KGS 40.000CBM
Seal-Numbers             35G-45G PER PIECE, SEARA BRAND
MLBR0699241              PACKED IN 20 KGS STANDARD CARTONS CONTAINING
00045213/490             4 POLYBAGS OF 5KGS EACH. -N.C.M.:0207.14.00
SEARA/HALAL              NW 27090.400 kgs / GW 28965.380 kgs

Tare: 4310 KG            Cargo stowed in a refrigerated container
Size:40' Type:RH         set at the shipper's requested carrying
Cnt.Ld.:FCLFCL           req. temperature of: -22.00 C.
AS PER SHIPPER.

                    ---------------------------------------------------------------
                    1350 CARTONS                               28965.800 KGS 40.000 CBM
                    ---------------------------------------------------------------

FREIGHT AS PER AGREEMENT            FREIGHT PREPAID BY SHIPPER
RUC:9BR01838723100000000000000627255E20
/

                         Additional export references:
                         9BR01838723100000000000000627255E20

Agreement No.(s): RSEC9000160-01078
```

Page: 1 of 1



**COPY not negotiable**

| Tariff Item No. | Total No. of Pkgs. | Declared value (See clause 4.2.(b)) | No. orig. B/L | SHIPPED ON BOARD: 17.10.20 |
|---|---|---|---|---|
| | | | 3 | |

RECEIVED for shipment as specified above in apparent good order and condition unless otherwise stated. The Goods to be delivered at above mentioned Port of Discharge or Place of Delivery, whichever applies, SUBJECT TO Terms and Conditions contained on reverse side hereof, to which Merchant agrees by accepting this Bill of Lading.
IN WITNESS WHEREOF the number of original Bills of Lading stated on this side next to this clause have been signed, one of which being accomplished, the others to stand void, unless compulsorily applicable law provides otherwise.
*Applicable only when used for MULTIMODAL TRANSPORTATION.

**Place and date of issue**
ITAJAI SC BR
19.10.20

Signed **as Agent for HAMBURG SÜD**

as **CARRIER**   Alianca Navegacao e Logistica Ltda.

Case 1:20-cv-03495-RCL   Document 1-4   Filed 12/01/20   Page 6 of 12

www.hamburgsud-line.com

## 1. DEFINITIONS

"Carrier" means Hamburg Südamerikanische Dampfschiffahrts-Gesellschaft A/S & Co KG, Willy-Brandt-Straße 59-65, 20457 Hamburg, Germany,Commercial Register: Amtsgericht Hamburg HRA 59448 (hereinafter "Hamburg Süd"), General Partner: Hamburg Süd A/S, Copenhagen (Denmark), Centrale Virksomhedsregister (CVR) No. 32345794. Executive Board: Søren Skou (CEO), Board of Directors: Jim Hagemann Snabe (Chairman), Executive Board of Hamburg Südamerikanische Dampfschiffahrts-Gesellschaft A/S & Co KG: Dr. Arnt Vespermann (CEO), Frank Smet (CCO), Jakob Wegge-Larsen (CFO).
"Carriage" means the whole or any part of the operations and services undertaken by Carrier in respect of the Goods covered by this bill of lading whether by water, land, or air.
"Charges" includes freight, deadfreight, demurrage and all expenses and money obligations incurred or payable in accordance with the applicable tariff or this bill of lading.
"COGSA" means the U.S. Carriage of Goods by Sea Act.
"Container" includes any open or closed container, van, trailer, flatbed, flatrack, transportable tank or any similar receptacle whatsoever used to consolidate the Goods and any connected equipment.
"Goods" means the cargo, in whole or part, received from the shipper and any Container not supplied by or on behalf of Carrier.
"Hague Rules" means the International Convention for the Unification of Certain Rules relating to Bills of Lading of 1924 including the Visby Amendment and the 1979 Protocol.
"Merchant" includes the booking party, shipper, consignee, receiver, holder of this bill of lading, or any person owning or entitled to possession of the Goods or of this bill of lading, and the servants and agents and principals of any of these, all of whom shall be jointly and severally liable to Carrier for the payment of all Charges, and for the performance of the obligations of any of them under this bill of lading.
"Subcontractor" includes the owners, managers, charterers, slot or space charterers, and operators of any Vessel (other than Carrier), underlying or substitute carriers; stevedores and terminal operators; and any direct or indirect servant, agent, or subcontractor (including their own subcontractors), or any other party employed by or on behalf of Carrier, or whose services or equipment have been used to perform this contract whether in contractual privity with Carrier or not.
"Vessel" means the ocean vessel named on the face side hereof, and any substitute vessel, feedership, barge or other means of conveyance by water used for the Carriage.
"VGM" means the verified gross mass obtained by a method prescribed by SOLAS and any laws in force at the port of loading

## 2. CARRIER'S TARIFF(S)

All terms and conditions of Carrier's applicable tariff(s), including but not limited to those pertaining to demurrage and detention are incorporated herein. Copies of the tariff(s) or relevant provisions thereof are obtainable from Carrier or the applicable regulatory body on request. In the event of a conflict between the terms and conditions of such tariff(s) and this bill of lading, the bill of lading shall prevail.

## 3. CHARGES

3.1 Charges shall be deemed earned on acceptance of Goods or Containers or other packages for shipment by Carrier and shall be paid by Merchant in full, without any offset, counterclaim or deduction, Goods and/or Vessel or other conveyance lost or not lost, and shall be non-returnable in any event.
3.2 Merchant shall remain responsible for all Charges, regardless whether the bill of lading be marked, in words or symbols, "Prepaid", or "Collect".
3.3 In case of non-payment of Charges or any other amount(s) due under this contract, Carrier is entitled to pursue the relevant amount(s) against Merchant or Goods and Merchant shall also be liable for interest on any overdue amount(s) as well as Carrier's reasonable attorney's fees and expenses incurred in collecting any amount(s) due.
3.4 In arranging for any services with respect to Goods, Carrier shall be considered Merchant's agent for all purposes. Charges and payment of Charges to parties other than Carrier shall not, in any event, be considered payment to Carrier.
3.5 Charges for cold treatment are for administration only and do not impose any responsibility on Carrier for completion or success of cold treatment as per the applicable regulations.

## 4. CARRIER'S RESPONSIBILITY

4.1 Except as otherwise noted herein, Carrier shall be responsible for loss of or damage to Goods under the following circumstances only:
(a) PORT-TO-PORT SHIPMENT
(1) When Goods have been lost or damaged from the time of loading on the Vessel until the time of discharge from the Vessel, Carrier's responsibility is governed by German law making the Hague-Rules compulsorily applicable. However, if the bill of lading covers a shipment to or from the USA, COGSA governs Carrier's responsibility and shall apply during the time from loading the Goods on the Vessel until discharge as well as during all times before loading and after discharge of the Goods from the Vessel.
(2) Carrier shall not be responsible for any fault of its personnel and of the Vessel's crew in cases of damage or loss caused by fire or explosion on board the Vessel ("Fire"), or caused by the navigation or management of the Vessel save for damage or loss caused when executing measures which were predominantly taken in the interest of the Goods ("Error in Navigation").
(3) Carrier shall not be responsible for any fault of other persons involved in the navigation or management of the Vessel, in particular, a pilot on board of the Vessel or the Crew of a tug boat assisting the Vessel, in cases of damage or loss caused by the navigation or the management of the Vessel, except for damage or loss caused, when executing measures, which were predominantly taken in the interest of the Goods ("Error in Navigation").
(4) Carrier is not deemed to have custody of the Goods before loading and after discharge, and Carrier is not responsible for acts or omissions of a terminal operator to which the Goods were submitted either by Carrier or by Merchant.
(b) MULTIMODAL TRANSPORT
(1) If it is established that loss or damage to Goods occurred during the port-to-port leg, Carrier's responsibility is governed by clause 4.1(a) and if it is established that loss or damage to Goods occurred during any other leg, the law applicable to such leg of transport shall apply except that if the bill of lading covers a shipment to or from the USA, COGSA shall apply for all legs of transport. If the law thus applicable is not compulsory Carrier's liability shall never exceed 2 Special Drawing Rights ("SDR") per kilo of gross weight of Goods lost or damaged.
(2) If it is not established during which leg of transport loss of or damage to Goods has occurred, Carrier's liability shall be determined in accordance with German law incorporating the Hague Rules, except for shipments to or from the USA in which case COGSA shall apply. Unless otherwise provided for herein, in no event shall the liability of Carrier exceed 2 SDR per kilo of gross weight of Goods lost or damaged.

### 4.2 LIMITATION OF LIABILITY

(a) In no event shall Carrier's liability under or in connection with this bill of lading exceed 2 SDR per kilo of the gross weight of the Goods lost or damaged, except that if COGSA applies, liability shall not exceed US$ 500 per package or per customary freight unit, as the case may be.
(b) The limitations of liability provided herein apply unless the nature and value of the Goods have been declared by Merchant prior to shipment and inserted in the box "Declared value" and extra freight paid if required. In no event shall the limitation amount exceed the declared value and nothing herein shall be construed as a waiver of limitation.
(c) The terms and conditions in Carrier's tariff(s) and herein (including the limitation of liability of US$ 500 per package or per customary freight unit and law and jurisdiction clauses in this bill of lading) shall apply to all multimodal shipments originating in the USA unless Merchant selects full value Carmack liability coverage under 49 U.S.C. § 11706 by notifying Carrier at the time of booking the Goods and prepaying a negotiated Carmack freight rate obtained from Carrier.

### 4.3 MISCELLANEOUS PROVISIONS

(a) Delay: Carrier does not undertake that Goods or any documents relating thereto will arrive at a particular time at the Port of Discharge or at the Place of Delivery and Carrier shall not under any circumstances whatsoever be liable for any direct, indirect or consequential loss or damage caused by delay, unless such delay was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result. If Carrier nevertheless shall be held legally liable for any loss or damage caused by delay, such liability shall in no event exceed 3 (three) times the freight paid.
(b) Except as provided herein, under no circumstances shall Carrier be liable for any indirect or consequential loss or damage or for any loss of profit or business from any cause whatsoever, unless such loss or damage was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result.
(c) The liberties, rights, defenses, immunities, exemptions, limitations of and exonerations from liability of whatsoever nature, provided in this bill of lading, or under statute, shall apply in any action or proceeding against Carrier whether founded in contract, tort, bailment or otherwise.
(d) Carrier shall, notwithstanding which legislation is applicable hereunder, be entitled to the benefit of Sections 30501 through 30511, Title 46, U.S. Code as may be amended as if the same were expressly set out herein, including but not limited to the Limitation of Liability Act and Fire Statute.
(e) Carrier shall have no liability whatsoever arising out of or in connection with the acts of any person (not employed or instructed by Carrier) who unlawfully, by the use of force or threats of any kind, damages, seizes, or exercises control over the Goods, over any Subcontractor, or over any means of transportation or storage of the Goods.

## 5. SUBCONTRACTING

(a) Carrier shall be entitled to sub-contract on any terms the whole or any part of the Carriage, loading, unloading, storing, warehousing or other handling whatsoever as well as any and all duties whatsoever undertaken by it in relation to the Goods or Containers or in performance of this contract.
(b) No Subcontractor shall in any circumstances be under any liability whatsoever to Merchant for any loss, damage or delay whether arising or resulting directly or indirectly from any act, neglect or default on the Subcontractor's part, and Merchant undertakes that no claim or allegation, whether in contract, bailment, tort, or otherwise, shall be made against any Subcontractor seeking to impose any liability whatsoever in connection with this contract. If any such claim or allegation should nevertheless be made, Merchant will indemnify Carrier against all consequences thereof.
(c) Without prejudice to the foregoing, every liberty, exemption, limitation of and exoneration from liability, condition, right, defense and immunity contained herein or available to Carrier including the right to enforce any law or jurisdiction provision contained herein shall also be available to and extend to every Subcontractor and Vessel which shall be entitled to enforce same against Merchant.

## 6. METHODS AND ROUTES OF CARRIAGE

6.1 Carrier may at any time and without notice to Merchant:
(a) Use any means of transport (water, land and/or air) or storage whatsoever;
(b) Transfer the Goods from one conveyance to another including transshipping or carrying them on a Vessel other than the Vessel named on the reverse side hereof or by any other means of transport or conveyance whatsoever;
(c) Sail with or without pilots, proceed by any route, place or port, in its discretion and at any speed and in any order, and omit, proceed to or stay at any place or port whatsoever, whether scheduled or not;
(d) Load and unload the Goods at any place or port (whether or not any such port is named on the reverse side hereof as the port of loading or port of discharge) and store the Goods at any such port or place;
(e) Terminate the transportation and discharge Goods or Containers, and require Merchant to take delivery. Upon Merchant's failure to do so, Carrier can take any measures including devanning, selling, disposing or storing the Goods at risk and expense of Merchant and Goods;
(f) Open any Container to inspect the contents, and if it appears that any part thereof cannot safely or properly be carried, either at all or without incurring additional expense, Carrier may terminate the transportation and/or incur any reasonable additional expenses to continue Carriage at Merchant's risk and expense;
(g) Carry livestock, explosives, munitions, warlike stores, dangerous or hazardous Goods or lawful Goods of any and all kinds; and/or
(h) Comply with any orders, directions or recommendations given by any government or authority.
6.2 The liberties set out in 6.1 above may be invoked by Carrier for any purpose whatsoever and whether or not connected with the Carriage of the Goods, including but not limited to loading or unloading the Goods, bunkering, repairs and/or dry docking of the Vessel. Anything done in accordance with clause 6.1 or any delay arising therefrom (i) shall be deemed within the contractual Carriage and shall not be a deviation and (ii) Carrier shall be entitled to full Charges and any additional freight, storage and all other expenses related thereto incurred by or on behalf of Carrier, all of which shall be paid and owing from Merchant, and Carrier shall have a lien on the Goods for same.

## 7. MATTERS AFFECTING PERFORMANCE

If at any time the Carriage (whether commenced or not) is or is likely to be affected by any hindrance, risk, danger, delay, difficulty or disadvantage of any kind and however arising, including but not limited to Acts of God, disruption in labor, war, civil commotion, political unrest, piracy, act of terrorism, and threat thereof, which cannot be avoided by the exercise of reasonable endeavors (and even though the circumstances affecting performance hereunder existed at the time this contract was entered into or when the Goods were received for Carriage), Carrier may, at its sole discretion and without prior notice to Merchant, either:
(1) Carry the Goods to the contracted port of discharge or place of delivery, whichever is applicable, by an alternative route to that indicated on the reverse side hereof or that which is usual for Goods consigned to that port of discharge or place of delivery and shall be entitled to charge such additional freight as Carrier may determine; or
(2) Suspend the Carriage of the Goods and store them ashore or afloat under these terms and conditions and endeavor to forward them as soon as reasonably possible and shall be entitled to such storage costs and additional freight as Carrier may determine; or
(3) abandon the Carriage of the Goods and place them at Merchant's disposal at any place or port which Carrier may deem safe and convenient, whereupon the responsibility of Carrier in respect of such Goods shall cease. Carrier shall nevertheless be entitled to full freight on the Goods received for the Carriage as well as any additional costs and Charges of the Carriage to, and delivery and storage at, such place or port.
Carrier election to use an alternative route or to suspend the Carriage under this clause shall not prejudice Carrier's right to subsequently to abandon the Carriage.

## 8. DECK CARGO

Goods, whether containerized or not, may be carried on or under deck without notice to Merchant and at Carrier's sole option, and Merchant expressly agrees that: (i) Containers carried on deck are considered for all legal purposes to be stowed under deck; (ii) Carrier shall not be required to note, mark or stamp on the bill of lading any statement of such on deck Carriage; (iii) Carriage of Goods on deck not in Container(s) is solely at Merchant's risk; (iv) Carrier is not responsible for any expense, loss, damage or delay to the Goods resulting from Carriage on deck; (v) Carriage of Goods on deck is subject to all terms and conditions of this bill of lading.

## 9. DELIVERY

9.1 Neither Carrier nor any Subcontractors are obliged to inform Merchant or Notify Party of Vessel's estimated or actual date or time of arrival, and if given, such information shall be considered gratuitous.
9.2 Merchant shall take delivery of the Goods within the time provided in Carrier's applicable Tariff(s). If Merchant fails to do so, Carrier may without notice take any reasonable measure at Merchant's sole risk and expense, including devanning, selling, disposing, or storing the Goods. Such measures shall constitute due delivery hereunder and all liability whatsoever of Carrier in respect of the Goods shall cease.
9.3 After discharge of the Goods, Carrier shall not be responsible for any claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses: (i) arising out of the Goods being in the custody of Customs or other authority and/or (ii) in the event Goods are improperly released or delivered by Customs or other authority to a third party without the consent of Carrier.

## 10. NOTICE OF CLAIM AND TIME TO SUE

If notice of loss, damage or claim is not given at time of discharge/removal of Goods by Merchant or, if not then apparent, within 3 (three) consecutive days thereafter, a presumption of discharge/delivery in good order shall arise. In any event, Carrier shall be discharged from all liability whatsoever in respect of the Goods, including any claims for indemnity or contribution, unless suit is brought within 1 (one) year after their delivery or the date when they should have been delivered, provided however that if a shorter period for commencement of suit applies under applicable law, any liability whatsoever of Carrier shall cease unless suit is brought within such shorter period.

## 11. CARRIER'S LIEN

Carrier shall have a lien on Goods and any Charges and documents relating thereto for all sums due under this contract or any other contract or undertaking to which Merchant was party or otherwise involved, which lien shall also extend to General Average contributions, salvage and cost of recovering such sums, inclusive of attorney fees, and shall survive delivery. Such lien may be enforced by Carrier by public or private sale at expense of and without notice to Merchant.

## 12. MERCHANT'S RESPONSIBILITY

12.1 Merchant warrants that in agreeing to the terms and conditions hereof, he is, or has the authority of, the person owning or entitled to the possession of the Goods and this bill of lading. Merchant further warrants that: (i) the particulars relating to the Goods as set out on the reverse hereof have been checked and that such particulars, and any other particulars furnished by or on behalf of Merchant are adequate and correct, and (ii) it has complied with all statutes, ordinances, regulations and requirements of whatsoever nature relative to the Goods, Containers or other packages, its/their documentation or in any other way relating thereto.
12.2 Merchant acknowledges that carriage of bullion, precious metals or minerals, diamonds, precious or semi-precious stones or coinage, artworks, antiques, jewellery or rare or precious artefacts, documents of value including but not limited to currency notes, bonds, bearer documents, negotiable instruments, bank drafts, checks, or payment orders, is subject to particulars furnished with the booking of the Goods and Carrier's written approval prior to shipment.
12.3 The party booking FCL shipments shall provide the VGM of each Container to the Carrier not later than the VGM-Cut-off-Date in a format pursuant to www.hamburgsud-line.com/howtovgm. Non-compliance herewith will bar the Carrier from loading the Container on the intended Vessel, in which case the Carrier shall be entitled to demurrage, detention and / or storage fees under the applicable Tariff. The booking party shall also be liable to the Carrier for any costs, damages and fees resulting from such non-compliance. Same applies to the shipper and the consignee named overleaf to the extent they are liable under the applicable law.
12.4 When a Container is stuffed by or on behalf of Merchant, such Container shall be deemed shipped as "Shipper's weight, load, stow, count and seal" and Carrier shall not be liable for loss of or damage to the Goods caused by the: (i) manner in which Container has been stuffed; (ii) unsuitability of Goods for Carriage in Containers, or (iii) Merchant's failure to seal the Container at the commencement of Carriage. Merchant agrees Carrier has no reasonable means of checking quantity, weight, condition, identity or existence of contents or manner in which Goods are stuffed, stowed and secured within Container or breakbulk cargo is packaged, or that same is accurate or proper.
12.5 When a Container is supplied by Carrier and has been stuffed by or on behalf of Merchant, Carrier shall not be liable for loss of or damage to the Goods caused by the unsuitability or defective condition of the Container, which would have been apparent upon reasonable inspection by Merchant at or prior to time Container was stuffed. It is the Merchant's obligation to set and/or check that the temperature controls on the container are at the required carrying temperature and to properly set the ventilation / gas level (CO2/O2) settings.
12.6 In absence of a written request to the contrary, Carrier is not under an obligation to provide a Container of any particular type or quality.
12.7 When any Container is owned or leased by Carrier, Merchant shall be liable, at tariff rates, for any delay beyond time allowed for the use of such Container, and for any loss, damage or expense incurred by Carrier as a result of failure to return the Container to Carrier in sound condition and state of cleanliness as when received, even if a condition caused by Goods does not then manifest itself and/or results in loss, damage or expense at a subsequent time. Payment therefor is due upon presentation of written cost estimates.
12.8 Carrier is committed to the concept of supply chain security. Merchant ensures the sealing of all packed Containers immediately after stuffing is completed and before placing them at Carrier's disposal for all destinations. Only high security seals must be used. All seals must meet the specifications for high security seals issued by the International Organization for Standardization under ISO/PAS 17712 and any subsequent amendment or new definition thereof.
12.9 When a Container is supplied by Merchant, Merchant warrants that: (i) the Container complies with CSC, ISO standards and all applicable rules and regulations established by IMO or other competent authorities or bodies, and (ii) the Container(s) meet or exceed applicable stacking weight and racking test load minimums.
12.10 Merchant shall be liable for and shall indemnify, defend and hold Carrier harmless against all claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses arising from any failure of Merchant to comply with the above-mentioned obligations or otherwise provided in this bill of lading or in any way related to the Goods or Container or which results from the acts or omissions of Merchant, its agents or servants or third parties for whom Merchant, its agents or servants are responsible.

## 13. DANGEROUS OR HAZARDOUS GOODS

13.1 No Goods which are or may become dangerous, hazardous, flammable, explosive, noxious or damaging (including radioactive material), or which are or may become liable to damage any person or property whatsoever, regardless of whether such Goods are listed in any international or national code, convention, listing or table, shall be tendered to Carrier for Carriage without its express consent in writing and without distinctly marking the Goods and the Container or other covering on the outside so as to indicate the nature and character of any such Goods and so as to comply with any applicable laws, regulations or requirements. If any such Goods are delivered to Carrier without such written consent and marking, or if in the opinion of Carrier the Goods are or are liable to become of a dangerous, hazardous, flammable, explosive, noxious or damaging nature, the same may at any time or place be unloaded, destroyed, disposed of, abandoned or rendered harmless without compensation to Merchant.
13.2 Merchant undertakes that such Goods are packed in a manner adequate to withstand the risk of Carriage having regard to their nature and in compliance with all laws, regulations or requirements which may be applicable to the Goods or Carriage including IMDG Code, ADR, RID, and CFR.
13.3 Merchant shall indemnify and defend Carrier against all claims, loss, liability, damage, delay, fines, attorney fees, costs, and/or expenses arising from or related to the Carriage of such Goods and/or breach of any of the warranties and obligations provided herein whether or not Merchant was aware of the nature of such Goods.

## 14. REEFER CONTAINERS

Containers with temperature- or atmosphere-controlled apparatus will not be furnished unless expressly contracted for in writing at time of booking and, when furnished, may entail increased Charges. In absence of an express request, it shall be conclusively presumed that use of a dry Container is appropriate for the Goods. Merchant must provide Carrier with desired set-temperature when delivering Containers to Carrier. Carrier shall not be responsible for: (i) the functioning of temperature- or atmosphere-controlled Containers not supplied by Carrier or related companies or (ii) the consequences of the Goods, when placed in any Container, being at a higher temperature than that required for the Carriage (hot stuffing) or (iii) the recording of temperatures in any form. The Carrier does not accept to comply with any governmental program or protocol.
Merchant acknowledges that temperature- or atmosphere-controlled Containers are not designed to freeze down cargo which has not been presented for stuffing at or below its designated carrying temperature or to monitor and control humidity levels, albeit a setting facility exists, in that humidity is influenced by many external factors and Carrier does not guarantee the maintenance of any intended level of humidity inside any Container.
Merchant acknowledges that Goods, which require refrigeration, ventilation or other specialized attention, were not verified by Carrier, when received, as being at the carrying temperature, humidity level or other condition designated by Merchant.

## 15. BOTH-TO-BLAME COLLISION CLAUSE

The Both-to-Blame Collision Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 16. GENERAL AVERAGE

16.1 General Average shall be adjusted, stated and settled according to York-Antwerp Rules 2016. Merchant shall give such cash deposit or other security as Carrier may deem sufficient to cover estimated General Average contribution of Goods before delivery as Carrier requires, or, if not so required, within 3 (three) months of delivery of Goods, whether or not at the time of delivery Merchant had notice of Carrier's lien. Carrier shall be under no obligation to exercise any lien for General Average contribution due from Merchant(s).
16.2 Cargo's contribution in General Average shall be paid even when such Average is result of fault, neglect or error of the Master, pilot, officers or crew. The New Jason Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 17. LAW AND JURISDICTION

Unless otherwise provided herein, any claim, dispute, suit or proceeding arising under or relating to this bill of lading shall be governed by the laws of Germany and subject to the exclusive jurisdiction of the courts of the City of Hamburg, except that at Carrier's sole option, it may commence proceedings against Merchant at any court or tribunal having jurisdiction.

## 18. NON-WAIVER AND SEVERABILITY

18.1 No servant or agent of Carrier shall have the power to waive or vary any of the terms hereof unless such waiver or variation is in writing and is specifically authorized or ratified in writing by an officer or director of Carrier having actual authority to bind Carrier to such waiver or variation.
18.2 Nothing herein shall operate to deprive Carrier of any statutory protection or defense, immunity, exemption, limitation of or exoneration from liability contained in applicable laws.
18.3 The terms and conditions of this bill of lading (including those of the applicable tariff(s)) are separable, and if any part or term is held invalid, such holding shall not affect the validity or enforceability of any other part or term hereof.

# Bill of Lading
## Multimodal Transport or Port-to-Port Shipment



www.hamburgsud-line.com

**Shipper**
JBS SA/SEARA ALIMENTOS LTDA
AV. PALUDO, 155 - INDUSTRIAL,
SEARA - SC, 89770-000, BRAZIL.

C.N.P.J. 02.916.265-0001-60

**B/L No. (also to be used as payment ref.)**
SUDU60ITJ030163D

**Booking No.**
0ITJ030163

**Export References**
0627255E20-A
SD.:
Vessel IMO No.: 9526966
INTBL:   TJ60638H   CNPJ-SH: 02916265000160

**Consignee** ("Not negotiable unless consigned to order")
TO ORDER.

**Forwarding Agent-References**

**Notify Party** (See cl. 9)
ZHONGSHAN CITY BENTENGHE WINE
TRADING CO., LTD.
NO.6, WEST 1 STREET, TIANWANG
ROAD, SHAGANG VILLAGE, EAST
DISTRICT, ZHONGSHAN CITY,
GUANGDONG, CHINA.

**Point and country of origin**

**Domestic Routing Instructions / Also Notify / Agent at Port of Discharge**

**Place of Receipt***

**Pre-carriage by***

**Port of Loading**
ITAJAI, BRITJ

**Ocean Vessel**
MAERSK LEON

**Voyage**
42E

**Originals to be released at**
ITAJAI, BRITJ

**Freight payable at**
ITAJAI, BRITJ(PAID)

**Port of Trans-Shipment***
SHANGHAI PORT, CHINA

**Place of Delivery***
NANSHA NEW PORT, CHINA

**Mode Load Area**

**Mode Disch. Area**

### PARTICULARS FURNISHED BY SHIPPER

| Marks & Nos. | Cont./Seal Nos. | No. of Pkgs. | Description of Goods | Gross Weight | Measurement |
|---|---|---|---|---|---|

1 - 40' CONTAINER   - SHIPPER'S LOAD, STOW, COUNT, WEIGHT AND SEAL

```
MNBU3622043              1350 CARTONS OF GRADE A FROZEN CHICKEN MID JOINT   28994.620 KGS 40.000CBM
Seal-Numbers                  WINGS 35G-45G PER PIECE, SEARA BRAND
MLBR0533475                   PACKED IN 20 KGS STANDARD CARTONS
00072947/490                  -N.C.M.:0207.14.00
SEARA/HALAL                   NW 27110.400 kgs / GW 28994.620 kgs

Tare: 4320 KG            Cargo stowed in a refrigerated container
Size:40' Type:RH         set at the shipper's requested carrying
Cnt.Ld.:FCLFCL           req. temperature of: -22.00 C.
AS PER SHIPPER.

                         ------------------------------------------------------------------
                         1350 CARTONS                                   28994.620 KGS 40.000 CBM
                         ------------------------------------------------------------------

FREIGHT AS PER AGREEMENT             FREIGHT PREPAID BY SHIPPER
RUC:9BR01838723100000000000000627255E20
/

                         Additional export references:
                         9BR01838723100000000000000627255E20

Agreement No.(s): RSEC9000160-01078
```

Page: 1 of 1

**COPY not negotiable**

| Tariff Item No. | Total No. of Pkgs. | Declared value (See clause 4.2.(b)) | No. orig. B/L | |
|---|---|---|---|---|
| | | | 3 | SHIPPED ON BOARD:   17.10.20 |

RECEIVED for shipment as specified above in apparent good order and condition unless otherwise stated. The Goods to be delivered at above mentioned Port of Discharge or Place of Delivery, whichever applies, SUBJECT TO Terms and Conditions contained on reverse side hereof, to which Merchant agrees by accepting this Bill of Lading.
IN WITNESS WHEREOF the number of original Bills of Lading stated on this side next to this clause have been signed, one of which being accomplished, the others to stand void, unless compulsorily applicable law provides otherwise.
*Applicable only when used for MULTIMODAL TRANSPORTATION.



**Place and date of issue**
ITAJAI SC BR
19.10.20

**Signed** as Agent for
HAMBURG SÜD

as CARRIER      Alianca Navegacao e Logistica Ltda.

# TERMS AND CONDITIONS FOR CARRIAGE

## 1. DEFINITIONS

"Carrier" means Hamburg Südamerikanische Dampfschiffahrts-Gesellschaft A/S & Co KG, Willy-Brandt-Straße 59-65, 20457 Hamburg, Germany,Commercial Register: Amtsgericht Hamburg HRA 59448 (hereinafter "Hamburg Süd"), General Partner: Hamburg Süd A/S, Copenhagen (Denmark), Centrale Virksomhedsregister (CVR) No. 32345794. Executive Board: Søren Skou (CEO), Board of Directors: Jim Hagemann Snabe (Chairman), Executive Board of Hamburg Südamerikanische Dampfschiffahrts-Gesellschaft A/S & Co KG: Dr. Arnt Vespermann (CEO), Frank Smet (CCO), Jakob Wegge-Larsen (CFO).

"Carriage" means the whole or any part of the operations and services undertaken by Carrier in respect of the Goods covered by this bill of lading whether by water, land, or air.

"Charges" includes freight, deadfreight, demurrage and all expenses and money obligations incurred or payable in accordance with the applicable tariff or this bill of lading.

"COGSA" means the U.S. Carriage of Goods by Sea Act.

"Container" includes any open or closed container, van, trailer, flatbed, flatrack, transportable tank or any similar receptacle whatsoever used to consolidate the Goods and any connected equipment.

"Goods" means the cargo, in whole or part, received from the shipper and any Container not supplied by or on behalf of Carrier.

"Hague Rules" means the International Convention for the Unification of Certain Rules relating to Bills of Lading of 1924 including the Visby Amendment and the 1979 Protocol.

"Merchant" includes the booking party, shipper, consignee, receiver, holder of this bill of lading, or any person owning or entitled to possession of the Goods or of this bill of lading, and the servants and agents and principals of any of these, all of whom shall be jointly and severally liable to Carrier for the payment of all Charges, and for the performance of the obligations of any of them under this bill of lading.

"Subcontractor" includes the owners, managers, charterers, slot or space charterers, and operators of any Vessel (other than Carrier); underlying or substitute carriers; stevedores and terminal operators; and any direct or indirect servant, agent, or subcontractor (including their own subcontractors), or any other party employed by or on behalf of Carrier, or whose services or equipment have been used to perform this contract whether in contractual privity with Carrier or not.

"Vessel" means the ocean vessel named on the face side hereof, and any substitute vessel, feedership, barge or other means of conveyance by water used for the Carriage.

"VGM" means the verified gross mass obtained by a method prescribed by SOLAS and any laws in force at the port of loading

## 2. CARRIER'S TARIFF(S)

All terms and conditions of Carrier's applicable tariff(s), including but not limited to those pertaining to demurrage and detention are incorporated herein. Copies of the tariff(s) or relevant provisions thereof are obtainable from Carrier or the applicable regulatory body on request. In the event of a conflict between the terms and conditions of such tariff(s) and this bill of lading, the bill of lading shall prevail.

## 3. CHARGES

3.1 Charges shall be deemed earned on acceptance of Goods or Containers or other packages for shipment by Carrier and shall be paid by Merchant in full, without any offset, counterclaim or deduction, Goods and/or Vessel or other conveyance lost or not lost, and shall be non-returnable in any event.

3.2 Merchant shall remain responsible for all Charges, regardless whether the bill of lading be marked, in words or symbols, "Prepaid", or "Collect".

3.3 In case of non-payment of Charges or any other amount(s) due under this contract, Carrier is entitled to pursue the relevant amount(s) against Merchant or Goods and Merchant shall also be liable for interest on any overdue amount(s) as well as Carrier's reasonable attorney's fees and expenses incurred in collecting any amount(s) due.

3.4 In arranging for any services with respect to Goods, Carrier shall be considered Merchant's agent for all purposes. Charges and payment of Charges to parties other than Carrier shall not, in any event, be considered payment to Carrier.

3.5 Charges for cold treatment are for administration only and do not impose any responsibility on Carrier for completion or success of cold treatment as per the applicable regulations.

## 4. CARRIER'S RESPONSIBILITY

4.1 Except as otherwise noted herein, Carrier shall be responsible for loss of or damage to Goods under the following circumstances only:

(a) PORT-TO-PORT SHIPMENT

(1) When Goods have been lost or damaged from the time of loading on the Vessel until the time of discharge from the Vessel, Carrier's responsibility is governed by German law making the Hague-Rules compulsorily applicable. However, if the bill of lading covers a shipment to or from the USA, COGSA governs Carrier's responsibility and shall apply during the time from loading the Goods on the Vessel until discharge as well as during all times before loading and after discharge of the Goods from the Vessel.

(2) Carrier shall not be responsible for any fault of its personnel and of the Vessel's crew in cases of damage or loss caused by fire or explosion on board the Vessel ("Fire"), or caused by the navigation or management of the Vessel save for damage or loss caused when executing measures which were predominantly taken in the interest of the Goods ("Error in Navigation").

(3) Carrier shall not be responsible for any fault of other persons involved in the navigation or management of the Vessel, in particular, a pilot on board of the Vessel or the Crew of a tug boat assisting the Vessel, in cases of damage or loss caused by the navigation or the management of the Vessel, except for damage or loss caused, when executing measures, which were predominantly taken in the interest of the Goods ("Error in Navigation").

(4) Carrier is not deemed to have custody of the Goods before loading and after discharge, and Carrier is not responsible for acts or omissions of a terminal operator to which the Goods were submitted either by Carrier or by Merchant.

(b) MULTIMODAL TRANSPORT

(1) If it is established that loss or damage to Goods occurred during the port-to-port leg, Carrier's responsibility is governed by clause 4.1(a) and if it is established that loss or damage to Goods occurred during any other leg, the law applicable to such leg of transport shall apply except that if the bill of lading covers a shipment to or from the USA, COGSA shall apply for all legs of transport. If the law thus applicable is not compulsory Carrier's liability shall never exceed 2 Special Drawing Rights ("SDR") per kilo of gross weight of Goods lost or damaged.

(2) If it is not established during which leg of transport loss of or damage to Goods has occurred, Carrier's liability shall be determined in accordance with German law incorporating the Hague Rules, except for shipments to or from the USA in which case COGSA shall apply. Unless otherwise provided for herein, in no event shall the liability of Carrier exceed 2 SDR per kilo of gross weight of Goods lost or damaged.

4.2 LIMITATION OF LIABILITY

(a) In no event shall Carrier's liability under or in connection with this bill of lading exceed 2 SDR per kilo of the gross weight of the Goods lost or damaged, except that if COGSA applies, liability shall not exceed US$ 500 per package or per customary freight unit, as the case may be.

(b) The limitations of liability provided herein apply unless the nature and value of the Goods have been declared by Merchant prior to shipment and inserted in the box "Declared value" and extra freight paid if required. In no event shall the limitation amount exceed the declared value and nothing herein shall be construed as a waiver of limitation.

(c) The terms and conditions in Carrier's tariff(s) and herein (including the limitation of liability of US$ 500 per package or per customary freight unit and law and jurisdiction clauses in this bill of lading) shall apply to all multimodal shipments originating in the USA unless Merchant selects full value Carmack liability coverage under 49 U.S.C. § 11706 by notifying Carrier at the time of booking the Goods and prepaying a negotiated Carmack freight rate obtained from Carrier.

4.3 MISCELLANEOUS PROVISIONS

(a) Delay: Carrier does not undertake that Goods or any documents relating thereto will arrive at a particular time at the Port of Discharge or at the Place of Delivery and Carrier shall not under any circumstances whatsoever be liable for any direct, indirect or consequential loss or damage caused by delay, unless such delay was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result. If Carrier nevertheless shall be held legally liable for any loss or damage caused by delay, such liability shall in no event exceed 3 (three) times the freight paid.

(b) Except as provided herein, under no circumstances shall Carrier be liable for any indirect or consequential loss or damage or for any loss of profit or business from any cause whatsoever, unless such loss or damage was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result.

(c) The liberties, rights, defenses, immunities, exemptions, limitations of and exonerations from liability of whatsoever nature, provided in this bill of lading, or under statute, shall apply in any action or proceeding against Carrier whether founded in contract, tort, bailment or otherwise.

(d) Carrier shall, notwithstanding which legislation is applicable hereunder, be entitled to the benefit of Sections 30501 through 30511, Title 46, U.S. Code as may be amended as if the same were expressly set out herein, including but not limited to the Limitation of Liability Act and Fire Statute.

(e) Carrier shall have no liability whatsoever arising out of or in connection with the acts of any person (not employed or instructed by Carrier) who unlawfully, by the use of force or threats of any kind, damages, seizes, or exercises control over the Goods, over any Subcontractor, or over any means of transportation or storage of the Goods.

## 5. SUBCONTRACTING

(a) Carrier shall be entitled to sub-contract on any terms the whole or any part of the Carriage, loading, unloading, storing, warehousing or other handling whatsoever as well as any and all duties whatsoever undertaken by it in relation to the Goods or Containers or in performance of this contract.

(b) No Subcontractor shall in any circumstances be under any liability whatsoever to Merchant for any loss, damage or delay whether arising or resulting directly or indirectly from any act, neglect or default on the Subcontractor's part, and Merchant undertakes that no claim or allegation, whether in contract, bailment, tort, or otherwise, shall be made against any Subcontractor seeking to impose any liability whatsoever in connection with this contract. If any such claim or allegation should nevertheless be made, Merchant will indemnify Carrier against all consequences thereof.

(c) Without prejudice to the foregoing, every liberty, exemption, limitation of and exoneration from liability, condition, right, defense and immunity contained herein or available to Carrier including the right to enforce any law or jurisdiction provision contained herein shall also be available to and extend to every Subcontractor and Vessel which shall be entitled to enforce same against Merchant.

## 6. METHODS AND ROUTES OF CARRIAGE

6.1 Carrier may at any time and without notice to Merchant:

(a) Use any means of transport (water, land and/or air) or storage whatsoever;

(b) Transfer the Goods from one conveyance to another including transshipping or carrying them on a Vessel other than the Vessel named on the reverse side hereof or by any other means of transport or conveyance whatsoever;

(c) Sail with or without pilots, proceed by any route, place or port, in its discretion and at any speed and in any order, and omit, proceed to or stay at any place or port whatsoever, whether scheduled or not;

(d) Load and unload the Goods at any place or port (whether or not any such port is named on the reverse side hereof as the port of loading or port of discharge) and store the Goods at any such port or place;

(e) Terminate the transportation and discharge Goods or Containers, and require Merchant to take delivery. Upon Merchant's failure to do so, Carrier can take any measures including devanning, selling, disposing or storing the Goods at risk and expense of Merchant and Goods;

(f) Open any Container to inspect the contents, and if it appears that any part thereof cannot safely or properly be carried, either at all or without incurring additional expense, Carrier may terminate the transportation and/or incur any reasonable additional expenses to continue Carriage at Merchant's risk and expense;

(g) Carry livestock, explosives, munitions, warlike stores, dangerous or hazardous Goods or lawful Goods of any and all kinds; and/or

(h) Comply with any orders, directions or recommendations given by any government or authority.

6.2 The liberties set out in 6.1 above may be invoked by Carrier for any purpose whatsoever and whether or not connected with the Carriage of the Goods, including but not limited to loading or unloading the Goods, bunkering, repairs and/or dry docking of the Vessel. Anything done in accordance with clause 6.1 or any delay arising therefrom (i) shall be deemed within the contractual Carriage and shall not be a deviation and (ii) Carrier shall be entitled to full Charges and any additional freight, storage and all other expenses related thereto incurred by or on behalf of Carrier, all of which shall be due and owing from Merchant, and Carrier shall have a lien on the Goods for same.

## 7. MATTERS AFFECTING PERFORMANCE

If at any time the Carriage (whether commenced or not) is or is likely to be affected by any hindrance, risk, danger, delay, difficulty or disadvantage of any kind and however arising, including but not limited to Acts of God, disruption in labor, war, civil commotion, political unrest, piracy, act of terrorism, and threat thereof, which cannot be avoided by the exercise of reasonable endeavors (and even though the circumstances affecting performance hereunder existed at the time this contract was entered into or when the Goods were received for Carriage), Carrier may, at its sole discretion and without prior notice to Merchant, either:

(1) Carry the Goods to the contracted port of discharge or place of delivery, whichever is applicable, by an alternative route to that indicated on the reverse side hereof or that which is usual for Goods consigned to that port of discharge or place of delivery and shall be entitled to charge such additional freight as Carrier may determine; or

(2) Suspend the Carriage of the Goods and store them ashore or afloat under these terms and conditions and endeavor to forward them as soon as reasonably possible and shall be entitled to such storage costs and additional freight as Carrier may determine; or

(3) abandon the Carriage of the Goods and place them at Merchant's disposal at any place or port which Carrier may deem safe and convenient, whereupon the responsibility of Carrier in respect of such Goods shall cease. Carrier shall nevertheless be entitled to full freight on the Goods received for the Carriage as well as any additional costs and Charges of the Carriage to, and delivery and storage at, such place or port.

Carrier election to use an alternative route or to suspend the Carriage under this clause shall not prejudice Carrier's right to subsequently to abandon the Carriage.

## 8. DECK CARGO

Goods, whether containerized or not, may be carried on or under deck without notice to Merchant and at Carrier's sole option, and Merchant expressly agrees that: (i) Containers carried on deck are considered for all legal purposes to be stowed under deck; (ii) Carrier shall not be required to note, mark or stamp on the bill of lading any statement of such on deck Carriage; (iii) Carriage of Goods on deck not in Container(s) is solely at Merchant's risk; (iv) Carrier is not responsible for any expense, loss, damage or delay to the Goods resulting from Carriage on deck; (v) Carriage of Goods on deck is subject to all terms and conditions of this bill of lading.

## 9. DELIVERY

9.1 Neither Carrier nor any Subcontractors are obliged to inform Merchant or Notify Party of Vessel's estimated or actual date or time of arrival, and if given, such information shall be considered gratuitous.

9.2 Merchant shall take delivery of the Goods within the time provided in Carrier's applicable Tariff(s). If Merchant fails to do so, Carrier may without notice take any reasonable measure at Merchant's sole risk and expense, including devanning, selling, disposing, or storing the Goods. Such measures shall constitute due delivery hereunder and all liability whatsoever of Carrier in respect of the Goods shall cease.

9.3 After discharge of the Goods, Carrier shall not be responsible for any claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses: (i) arising out of the Goods being in the custody of Customs or other authority and/or (ii) in the event the Goods are improperly released or delivered by Customs or other authority to a third party without the consent of Carrier.

## 10. NOTICE OF CLAIM AND TIME TO SUE

If notice of loss, damage or claim is not given at time of discharge/removal of Goods by Merchant or, if not then apparent, within 3 (three) consecutive days thereafter, a presumption of discharge/delivery in good order shall arise. In any event, Carrier shall be discharged from all liability whatsoever in respect of the Goods, including any claims for indemnity or contribution, unless suit is brought within 1 (one) year after their delivery or the date when they should have been delivered, provided however that if a shorter period for commencement of suit applies under applicable law, any liability whatsoever of Carrier shall cease unless suit is brought within such shorter period.

## 11. CARRIER'S LIEN

Carrier shall have a lien on Goods and any Charges and documents relating thereto for all sums due under this contract or any other contract or undertaking to which Merchant was party or otherwise involved, which lien shall also extend to General Average contributions, salvage and cost of recovering such sums, inclusive of attorney fees, and shall survive delivery. Such lien may be enforced by Carrier by public or private sale at expense of and without notice to Merchant.

## 12. MERCHANT'S RESPONSIBILITY

12.1 Merchant warrants that in agreeing to the terms and conditions hereof, he is, or has the authority of, the person owning or entitled to the possession of the Goods and this bill of lading. Merchant further warrants that: (i) the particulars relating to the Goods as set out on the reverse hereof have been checked and that such particulars, and any other particulars furnished by or on behalf of Merchant are adequate and correct, and (ii) it has complied with all statutes, ordinances, regulations and requirements of whatsoever nature relative to the Goods, Containers or other packages, its/their documentation or in any other way relating thereto.

12.2 Merchant acknowledges that carriage of bullion, precious metals or minerals, diamonds, precious or semi-precious stones or coinage, artworks, antiques, jewellery or rare or precious artefacts, documents of value including but not limited to currency notes, bonds, bearer documents, negotiable instruments, bank drafts, checks, or payment orders, is subject to particulars furnished with the booking of the Goods and Carrier's written approval prior to shipment.

12.3 The party booking FCL shipments shall provide the VGM of each Container to the Carrier not later than the VGM-Cut-off-Date in a format pursuant to www.hamburgsud-line.com/howtovgm. Non-compliance herewith will bar the Carrier from loading the Container on the intended Vessel, in which case the Carrier shall be entitled to demurrage, detention and / or storage fees under the applicable Tariff. The booking party shall also be liable to the Carrier for any costs, damages and fees resulting from such non-compliance. Same applies to the shipper and the consignee named overleaf to the extent they are liable under the applicable law.

12.4 When a Container is stuffed by or on behalf of Merchant, such Container shall be deemed shipped as "Shipper's weight, load, stow, count and seal" and Carrier shall not be liable for loss of or damage to the Goods caused by the: (i) manner in which Container has been stuffed; (ii) unsuitability of Goods for Carriage in Containers, or (iii) Merchant's failure to seal the Container at the commencement of Carriage. Merchant agrees Carrier has no reasonable means of checking quantity, weight, condition, identity or existence of contents or manner in which Goods are stuffed, stowed and secured within Container or breakbulk cargo is packaged, or that same is accurate or proper.

12.5 When a Container is supplied by Carrier and has been stuffed by or on behalf of Merchant, Carrier shall not be liable for loss of or damage to the Goods caused by the unsuitability or defective condition of the Container, which would have been apparent upon reasonable inspection by Merchant at or prior to time Container was stuffed. It is the Merchant's obligation to set and/or check that the temperature controls on the container are at the required carrying temperature and to properly set the ventilation / gas level (CO2/O2) settings.

12.6 In absence of a written request to the contrary, Carrier is not under an obligation to provide a Container of any particular type or quality.

12.7 When any Container is owned or leased by Carrier, Merchant shall be liable, at tariff rates, for any delay beyond time allowed for the use of such Container, and for any loss, damage or expense incurred by Carrier as a result of failure to return the Container to Carrier in sound condition and state of cleanliness as when received, even if a condition caused by Goods does not then manifest itself and/or results in loss, damage or expense at a subsequent time. Payment therefor is due upon presentation of written cost estimates.

12.8 Carrier is committed to the concept of supply chain security. Merchant ensures the sealing of all packed Containers immediately after stuffing is completed and before placing them at Carrier's disposal for all destinations. Only high security seals must be used. All seals must meet the specifications for high security seals issued by the International Organization for Standardization under ISO/PAS 17712 and any subsequent amendment or new definition thereof.

12.9 When a Container is supplied by Merchant, Merchant warrants that: (i) the Container complies with CSC, ISO standards and all applicable rules and regulations established by IMO or other competent authorities or bodies, and (ii) the Container(s) meet or exceed applicable stacking weight and racking test load minimums.

12.10 Merchant shall be liable for and shall indemnify, defend and hold Carrier harmless against all claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses arising from any failure of Merchant to comply with the above-mentioned obligations or otherwise provided in this bill of lading or in any way related to the Goods or Container or which results from the acts or omissions of Merchant, its agents or servants or third parties for whom Merchant, its agents or servants are responsible.

## 13. DANGEROUS OR HAZARDOUS GOODS

13.1 No Goods which are or may become dangerous, hazardous, flammable, explosive, noxious or damaging (including radioactive material), or which are or may become liable to damage any person or property whatsoever, regardless of whether such Goods are listed in any international or national code, convention, listing or table, shall be tendered to Carrier for Carriage without its express consent in writing and without distinctly marking the Goods and the Container or other covering on the outside so as to indicate the nature and character of any such Goods and so as to comply with any applicable laws, regulations or requirements. If any such Goods are delivered to Carrier without such written consent and marking, or if in the opinion of Carrier the Goods are or are liable to become of a dangerous, hazardous, flammable, explosive, noxious or damaging nature, the same may at any time or place be unloaded, destroyed, disposed of, abandoned or rendered harmless without compensation to Merchant.

13.2 Merchant undertakes that such Goods are packed in a manner adequate to withstand the risk of Carriage having regard to their nature and in compliance with all laws, regulations or requirements which may be applicable to the Goods or Carriage including IMDG Code, ADR, RID, and CFR.

13.3 Merchant shall indemnify and defend Carrier against all claims, loss, liability, damage, delay, fines, attorney fees, costs, and/or expenses arising from or related to the Carriage of such Goods and/or breach of any of the warranties and obligations provided herein whether or not Merchant was aware of the nature of such Goods.

## 14. REEFER CONTAINERS

Containers with temperature- or atmosphere-controlled apparatus will not be furnished unless expressly contracted for in writing at time of booking and, when furnished, may entail increased Charges. In absence of an express request, it shall be conclusively presumed that use of a dry Container is appropriate for the Goods. Merchant must provide Carrier with desired set-temperature when delivering Containers to Carrier. Carrier shall not be responsible for: (i) the functioning of temperature- or atmosphere-controlled Containers not supplied by Carrier or related companies or (ii) the consequences of the Goods, when placed in any Container, being at a higher temperature than that required for the Carriage (hot stuffing) or (iii) the recording of temperatures in any form. The Carrier does not accept to comply with any governmental program or protocol.

Merchant acknowledges that temperature- or atmosphere-controlled Containers are not designed to freeze down cargo which has not been presented for stuffing at or below its designated carrying temperature or to monitor and control humidity levels, albeit a setting facility exists, in that humidity is influenced by many external factors and Carrier does not guarantee the maintenance of any intended level of humidity inside any Container.

Merchant acknowledges that Goods, which require refrigeration, ventilation or other specialized attention, were not verified by Carrier, when received, as being at the carrying temperature, humidity level or other condition designated by Merchant.

## 15. BOTH-TO-BLAME COLLISION CLAUSE

The Both-to-Blame Collision Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 16. GENERAL AVERAGE

16.1 General Average shall be adjusted, stated and settled according to York-Antwerp Rules 2016. Merchant shall give such cash deposit or other security as Carrier may deem sufficient to cover estimated General Average contribution of Goods before delivery as Carrier requires, or, if not so required, within 3 (three) months of delivery of Goods, whether or not at the time of delivery Merchant had notice of Carrier's lien. Carrier shall be under no obligation to exercise any lien for General Average contribution due from Merchant(s).

16.2 Cargo's contribution in General Average shall be paid even when such Average is result of fault, neglect or error of the Master, pilot, officers or crew. The New Jason Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 17. LAW AND JURISDICTION

Unless otherwise provided herein, any claim, dispute, suit or proceeding arising under or relating to this bill of lading shall be governed by the laws of Germany and subject to the exclusive jurisdiction of the courts of the City of Hamburg, except that at Carrier's sole option, it may commence proceedings against Merchant at any court or tribunal having jurisdiction.

## 18. NON-WAIVER AND SEVERABILITY

18.1 No servant or agent of Carrier shall have the power to waive or vary any of the terms hereof unless such waiver or variation is in writing and is specifically authorized or ratified in writing by an officer or director of Carrier having actual authority to bind Carrier to such waiver or variation.

18.2 Nothing herein shall operate to deprive Carrier of any statutory protection or defense, immunity, exemption, limitation of or exoneration from liability contained in applicable laws.

18.3 The terms and conditions of this bill of lading (including those of the applicable tariff(s)) are separable, and if any part or term is held invalid, such holding shall not affect the validity or enforceability of any other part or term hereof.

# Bill of Lading
## Multimodal Transport or Port-to-Port Shipment


www.hamburgsud-line.com

**Shipper**
JBS SA/SEARA ALIMENTOS LTDA
AV. PALUDO, 155 - INDUSTRIAL,
SEARA - SC, 89770-000, BRAZIL.

C.N.P.J. 02.916.265-0001-60

**B/L No. (also to be used as payment ref.)**
SUDU60ITJ030163E

**Booking No.**
0ITJ030163

**Export References**
0627255E20-A
SD.:
Vessel IMO No.: 9526966
INTBL:   TJ60638H     CNPJ-SH: 02916265000160

**Consignee** ("Not negotiable unless consigned to order")
TO ORDER.

**Notify Party** (See cl. 9)
ZHONGSHAN CITY BENTENGHE WINE
TRADING CO., LTD.
NO.6, WEST 1 STREET, TIANWANG
ROAD, SHAGANG VILLAGE, EAST
DISTRICT, ZHONGSHAN CITY,
GUANGDONG, CHINA.

**Forwarding Agent-References**

**Point and country of origin**

**Domestic Routing Instructions / Also Notify / Agent at Port of Discharge**

**Place of Receipt***

**Pre-carriage by***

**Port of Loading**
ITAJAI, BRITJ

**Ocean Vessel**
MAERSK LEON

**Voyage**
42E

**Originals to be released at**
ITAJAI, BRITJ

**Freight payable at**
ITAJAI, BRITJ(PAID)

**Port of Trans-Shipment***
SHANGHAI PORT, CHINA

**Place of Delivery***
NANSHA NEW PORT, CHINA

**Mode Load Area**

**Mode Disch. Area**

### PARTICULARS FURNISHED BY SHIPPER

| Marks & Nos. | Cont./Seal Nos. | No. of Pkgs. | Description of Goods | Gross Weight | Measurement |
|---|---|---|---|---|---|

1 - 40' CONTAINER   - SHIPPER'S LOAD, STOW, COUNT, WEIGHT AND SEAL

```
MNBU0553838           1350  CARTONS OF GRADE A FROZEN CHICKEN MID JOINT    28994.620 KGS 40.000CBM
Seal-Numbers                WINGS 35G-45G PER PIECE, SEARA BRAND
MLBR0775202                 PACKED IN 20 KGS STANDARD CARTONS
00021147/490                -N.C.M.:0207.14.00
SEARA/HALAL                 NW 27110.400 kgs / GW 28994.620 kgs

Tare: 4300 KG               Cargo stowed in a refrigerated container
Size:40' Type:RH            set at the shipper's requested carrying
Cnt.Ld.:FCLFCL              req. temperature of: -22.00 C.
AS PER SHIPPER.


                     ------------------------------------------------------------------
                      1350 CARTONS                                  28994.620 KGS  40.000 CBM
                     ------------------------------------------------------------------


FREIGHT AS PER AGREEMENT             FREIGHT PREPAID BY SHIPPER
RUC:9BR01838723100000000000000627255E20
/
                          Additional export references:
                          9BR01838723100000000000000627255E20

 Agreement No.(s): RSEC9000160-01078


 Page:  1 of  1
```

**COPY not negotiable**

| Tariff Item No. | Total No. of Pkgs. | Declared value (See clause 4.2.(b)) | No. orig. B/L | |
|---|---|---|---|---|
| | | | 3 | SHIPPED ON BOARD:   17.10.20 |

RECEIVED for shipment as specified above in apparent good order and condition unless otherwise stated. The Goods to be delivered at above mentioned Port of Discharge or Place of Delivery, whichever applies, SUBJECT TO Terms and Conditions contained on reverse side hereof, to which Merchant agrees by accepting this Bill of Lading.
IN WITNESS WHEREOF the number of original Bills of Lading stated on this side next to this clause have been signed, one of which being accomplished, the others to stand void, unless compulsorily applicable law provides otherwise.
*Applicable only when used for MULTIMODAL TRANSPORTATION.



**Place and date of issue**
ITAJAI SC BR
19.10.20

**Signed as Agent for HAMBURG SÜD**

as CARRIER    Alianca Navegacao e Logistica Ltda.

# TERMS AND CONDITIONS FOR CARRIAGE

## 1. DEFINITIONS
"Carrier" means Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co KG, Willy-Brandt-Straße 59-65, 20457 Hamburg, Germany,Commercial Register: Amtsgericht Hamburg HRA 58448 (hereinafter "Hamburg Süd"), General Partner: Hamburg Süd A/S, Copenhagen (Denmark), Centrale Virksomhedsregister (CVR) No. 32345794. Executive Board: Søren Skou (CEO), Board of Directors: Jim Hagemann Snabe (Chairman), Executive Board of Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co KG: Dr. Arnt Vespermann (CEO), Frank Smet (CCO), Jakob Wegge-Larsen (CFO).
"Carriage" means the whole or any part of the operations and services undertaken by Carrier in respect of the Goods covered by this bill of lading whether by water, land, or air.
"Charges" includes freight, deadfreight, demurrage and all expenses and money obligations incurred or payable in accordance with the applicable tariff or this bill of lading.
"COGSA" means the U.S. Carriage of Goods by Sea Act.
"Container" includes any open or closed container, van, trailer, flatbed, flatrack, transportable tank or any similar receptacle whatsoever used to consolidate the Goods and any connected equipment.
"Goods" means the cargo, in whole or part, received from the shipper and any Container not supplied by or on behalf of Carrier.
"Hague Rules" means the International Convention for the Unification of Certain Rules relating to Bills of Lading of 1924 including the Visby Amendment and the 1979 Protocol.
"Merchant" includes the booking party, shipper, consignee, receiver, holder of this bill of lading, or any person owning or entitled to possession of the Goods or of this bill of lading, and the servants and agents and principals of any of these, all of whom shall be jointly and severally liable to Carrier for the payment of all Charges, and for the performance of the obligations of any of them under this bill of lading.
"Subcontractor" includes the owners, managers, charterers, slot or space charterers, and operators of any Vessel (other than Carrier), underlying or substitute carriers; stevedores and terminal operators; and any direct or indirect servant, agent, or subcontractor (including their own subcontractors), or any other party employed by or on behalf of Carrier, or whose services or equipment have been used to perform this contract whether in contractual privity with Carrier or not.
"Vessel" means the ocean vessel named on the face side hereof, and any substitute vessel, feedership, barge or other means of conveyance by water used for the Carriage.
"VGM" means the verified gross mass obtained by a method prescribed by SOLAS and any laws in force at the port of loading

## 2. CARRIER'S TARIFF(S)
All terms and conditions of Carrier's applicable tariff(s), including but not limited to those pertaining to demurrage and detention are incorporated herein. Copies of the tariff(s) or relevant provisions thereof are obtainable from Carrier or the applicable regulatory body on request. In the event of a conflict between the terms and conditions of such tariff(s) and this bill of lading, the bill of lading shall prevail.

## 3. CHARGES
3.1 Charges be deemed earned on acceptance of Goods or Containers or other packages for shipment by Carrier and shall be paid by Merchant in full, without any offset, counterclaim or deduction, Goods and/or Vessel or other conveyance lost or not lost, and shall be non-returnable in any event.
3.2 Merchant shall remain responsible for all Charges, regardless whether the bill of lading be marked, in words or symbols, "Prepaid", or "Collect".
3.3 In case of non-payment of Charges or any other amount(s) due under this contract, Carrier is entitled to pursue the relevant amount(s) against Merchant or Goods and Merchant shall also be liable for interest on any overdue amount(s) as well as Carrier's reasonable attorney's fees and expenses incurred in collecting any amount(s) due.
3.4 In arranging for any services with respect to Goods, Carrier shall be considered Merchant's agent for all purposes. Charges and payment of Charges to parties other than Carrier shall not, in any event, be considered payment to Carrier.
3.5 Charges for cold treatment are for administration only and do not impose any responsibility on Carrier for completion or success of cold treatment as per the applicable regulations.

## 4. CARRIER'S RESPONSIBILITY
4.1 Except as otherwise noted herein, Carrier shall be responsible for loss of or damage to Goods under the following circumstances only:
(a) PORT-TO-PORT SHIPMENT
(1) When Goods have been lost or damaged from the time of loading on the Vessel until the time of discharge from the Vessel, Carrier's responsibility is governed by German law making the Hague-Rules compulsorily applicable. However, if the bill of lading covers a shipment to or from the USA, COGSA governs Carrier's responsibility and shall apply during the time from loading the Goods on the Vessel until discharge as well as during all times before loading and after discharge of the Goods from the Vessel.
(2) Carrier shall not be responsible for any fault of its personnel and of the Vessel's crew in cases of damage or loss caused by fire or explosion on board the Vessel ("Fire"), or caused by the navigation or management of the Vessel save for damage or loss caused when executing measures which were predominantly taken in the interest of the Goods ("Error in Navigation").
(3) Carrier shall not be responsible for any fault of other persons involved in the navigation or management of the Vessel, in particular, a pilot on board of the Vessel or the Crew of a tug boat assisting the Vessel, in cases of damage or loss caused by the navigation or the management of the Vessel, except for damage or loss caused, when executing measures, which were predominantly taken in the interest of the Goods ("Error in Navigation").
(4) Carrier is not deemed to have custody of the Goods before loading and after discharge, and Carrier is not responsible for acts or omissions of a terminal operator to which the Goods were submitted either by Carrier or by Merchant.
(b) MULTI-MODAL TRANSPORT
(1) If it is established that loss or damage to Goods occurred during the port-to-port leg, Carrier's responsibility is governed by clause 4.1(a) and if it is established that loss or damage occurred during any other leg, the law applicable to such leg of transport shall apply except that if the bill of lading covers a shipment to or from the USA, COGSA shall apply for all legs of transport. If the law thus applicable is not compulsory Carrier's liability shall never exceed 2 Special Drawing Rights ("SDR") per kilo of gross weight of Goods lost or damaged.
(2) If it is not established during which leg of transport loss of or damage to Goods has occurred, Carrier's liability shall be determined in accordance with German law incorporating the Hague Rules, except for shipments to or from the USA in which case COGSA shall apply. Unless otherwise provided for herein, in no event shall the liability of Carrier exceed 2 SDR per kilo of gross weight of Goods lost or damaged.
4.2 LIMITATION OF LIABILITY
(a) In no event shall Carrier's liability under or in connection with this bill of lading exceed 2 SDR per kilo of the gross weight of the Goods lost or damaged, except that if COGSA applies, liability shall not exceed US$ 500 per package or per customary freight unit, as the case may be.
(b) The limitations of liability provided herein apply unless the nature and value of the Goods have been declared by Merchant prior to shipment and inserted in the box "Declared value" and extra freight paid if required. In no event shall the limitation amount exceed the declared value and nothing herein shall be construed as a waiver of limitation.
(c) The terms and conditions in Carrier's tariff(s) and herein (including the limitation of liability of US$ 500 per package or per customary freight unit and law and jurisdiction clauses in this bill of lading) shall apply to all multimodal shipments originating in the USA unless Merchant selects full value Carmack liability coverage under 49 U.S.C. § 11706 by notifying Carrier at the time of booking the Goods and prepaying a negotiated Carmack freight rate obtained from Carrier.
4.3 MISCELLANEOUS PROVISIONS
(a) Delay: Carrier does not undertake that Goods or any documents relating thereto will arrive at a particular time at the Port of Discharge or at the Place of Delivery and Carrier shall not under any circumstances whatsoever be liable for any direct, indirect or consequential loss or damage caused by delay, unless such delay was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result. If Carrier nevertheless shall be held legally liable for any loss or damage caused by delay, such liability shall in no event exceed 3 (three) times the freight paid.
(b) Except as provided herein, under no circumstances shall Carrier be liable for any indirect or consequential loss or damage or for any loss of profit or business from any cause whatsoever, unless such loss or damage was caused by Carrier, its servants or agents with the intention to cause damage, or recklessly or with knowledge that such damage would probably result.
(c) The liberties, rights, defenses, immunities, exemptions, limitations of and exonerations from liability of whatsoever nature, provided in this bill of lading, or under statute, shall apply in any action or proceeding against Carrier whether founded in contract, tort, bailment or otherwise.
(d) Carrier shall, notwithstanding which legislation is applicable hereunder, be entitled to the benefit of Sections 30501 through 30511, Title 46, U.S. Code as may be amended as if the same were expressly set out herein, including but not limited to the Limitation of Liability Act and Fire Statute.
(e) Carrier shall have no liability whatsoever arising out of or in connection with the acts of any person (not employed or instructed by Carrier) who unlawfully, by the use of force or threats of any kind, damages, seizes, or exercises control over the Goods, over any Subcontractor, or over any means of transportation or storage of the Goods.

## 5. SUBCONTRACTING
(a) Carrier shall be entitled to sub-contract on any terms the whole or any part of the Carriage, loading, unloading, storing, warehousing or other handling whatsoever as well as any and all duties whatsoever undertaken by it in relation to the Goods or Containers or in performance of this contract.
(b) No Subcontractor shall in any circumstances be under any liability whatsoever to Merchant for any loss, damage or delay whether arising or resulting directly or indirectly from any act, neglect or default on the Subcontractor's part, and Merchant undertakes that no claim or allegation, whether in contract, bailment, tort, or otherwise, shall be made against any Subcontractor seeking to impose any liability whatsoever in connection with this contract. If any such claim or allegation should nevertheless be made, Merchant will indemnify Carrier against all consequences thereof.
(c) Without prejudice to the foregoing, every liberty, exemption, limitation of and exoneration from liability, condition, right, defense and immunity contained herein or available to Carrier including the right to enforce any law or jurisdiction provision contained herein shall also be available to and extend to every Subcontractor and Vessel which shall be entitled to enforce same against Merchant.

## 6. METHODS AND ROUTES OF CARRIAGE
6.1 Carrier may at any time and without notice to Merchant:
(a) Use any means of transport (water, land and/or air) or storage whatsoever;
(b) Transfer the Goods from one conveyance to another including transshipping or carrying them on a Vessel other than the Vessel named on the reverse side hereof or by any other means of transport or conveyance whatsoever;
(c) Sail with or without pilots, proceed by any route, place or port, in its discretion and at any speed and in any order, and omit, proceed to or stay at any place or port whatsoever, whether scheduled or not;
(d) Load and unload the Goods at any place or port (whether or not any such port is named on the reverse side hereof as the port of loading or port of discharge) and store the Goods at any such port or place;
(e) Terminate the transportation and discharge Goods or Containers, and require Merchant to take delivery. Upon Merchant's failure to do so, Carrier can take any measures including devanning, selling, disposing or storing the Goods at risk and expense of Merchant and Goods;
(f) Open any Container to inspect the contents, and if it appears that any part thereof cannot safely or properly be carried, either at all or without incurring additional expense, Carrier may terminate the transportation and/or incur any reasonable additional expenses to continue Carriage at Merchant's risk and expense;
(g) Carry livestock, explosives, munitions, warlike stores, dangerous or hazardous Goods or lawful Goods of any and all kinds; and/or
(h) Comply with any orders, directions or recommendations given by any government or authority.
6.2 The liberties set out in 6.1 above may be invoked by Carrier for any purpose whatsoever and whether or not connected with the Carriage of the Goods, including but not limited to loading or unloading the Goods, bunkering, repairs and/or dry docking of the Vessel. Anything done in accordance with clause 6.1 or any delay arising therefrom (i) shall be deemed within the contractual Carriage and shall not be a deviation and (ii) Carrier shall be entitled to full Charges and any additional freight, storage and all other expenses related thereto incurred by or on behalf of Carrier, all of which shall be due and owing from Merchant, and Carrier shall have a lien on the Goods for same.

## 7. MATTERS AFFECTING PERFORMANCE
If at any time the Carriage (whether commenced or not) is or is likely to be affected by any hindrance, risk, danger, delay, difficulty or disadvantage of any kind and however arising, including but not limited to Acts of God, disruption in labor, war, civil commotion, political unrest, piracy, act of terrorism, and threat thereof, which cannot be avoided by the exercise of reasonable endeavors (and even though the circumstances affecting performance hereunder existed at the time this contract was entered into or when the Goods were received for Carriage), Carrier may, at its sole discretion and without prior notice to Merchant, either:
(1) Carry the Goods to the contracted port of discharge or place of delivery, whichever is applicable, by an alternative route to that indicated on the reverse side hereof or that which is usual for Goods consigned to that port of discharge or place of delivery and shall be entitled to charge such additional freight as Carrier may determine; or
(2) Suspend the Carriage of the Goods and store them ashore or afloat under these terms and conditions and endeavor to forward them as soon as reasonably possible and shall be entitled to such storage costs and additional freight as Carrier may determine; or
(3) abandon the Carriage of the Goods and place them at Merchant's disposal at any place or port which Carrier may deem safe and convenient, whereupon the responsibility of Carrier in respect of such Goods shall cease. Carrier shall nevertheless be entitled to full freight on the Goods received for the Carriage as well as any additional costs and Charges of the Carriage to, and delivery and storage at, such place or port.
Carrier election to use an alternative route or to suspend the Carriage under this clause shall not prejudice Carrier's right to subsequently to abandon the Carriage.

## 8. DECK CARGO
Goods, whether containerized or not, may be carried on or under deck without notice to Merchant and at Carrier's sole option, and Merchant expressly agrees that; (i) Containers carried on deck are considered for all legal purposes to be stowed under deck; (ii) Carrier shall not be required to note, mark or stamp on the bill of lading any statement of such on deck Carriage; (iii) Carriage of Goods on deck not in Container(s) is solely at Merchant's risk; (iv) Carrier is not responsible for any expense, loss, damage or delay to the Goods resulting from Carriage on deck; (v) Carriage of Goods on deck is subject to all terms and conditions of this bill of lading.

## 9. DELIVERY
9.1 Neither Carrier nor any Subcontractors are obliged to inform Merchant or Notify Party of Vessel's estimated or actual date or time of arrival, and if given, such information shall be considered gratuitous.
9.2 Merchant shall take delivery of the Goods within the time provided in Carrier's applicable Tariff(s). If Merchant fails to do so, Carrier may without notice take any reasonable measure at Merchant's sole risk and expense, including devanning, selling, disposing, or storing the Goods. Such measures shall constitute due delivery hereunder and all liability whatsoever of Carrier in respect of the Goods shall cease.
9.3 After discharge of the Goods, Carrier shall not be responsible for any claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses: (i) arising out of the Goods being in the custody of Customs or other authority and/or (ii) in the event the Goods are improperly released or delivered by Customs or other authority to a third party without the consent of Carrier.

## 10. NOTICE OF CLAIM AND TIME TO SUE
If notice of loss, damage or claim is not given at time of discharge/removal of Goods by Merchant or, if not then apparent, within 3 (three) consecutive days thereafter, a presumption of discharge/delivery in good order shall arise. In any event, Carrier shall be discharged from all liability whatsoever in respect of the Goods, including any claims for indemnity or contribution, unless suit is brought within 1 (one) year after their delivery or the date when they should have been delivered, provided however that if a shorter period for commencement of suit applies under applicable law, any liability whatsoever of Carrier shall cease unless suit is brought within such shorter period.

## 11. CARRIER'S LIEN
Carrier shall have a lien on Goods and any Charges and documents relating thereto for all sums due under this contract or any other contract or undertaking to which Merchant was party or otherwise involved, which lien shall also extend to General Average contributions, salvage and cost of recovering such sums, inclusive of attorney fees, and shall survive delivery. Such lien may be enforced by Carrier by public or private sale at expense of and without notice to Merchant.

## 12. MERCHANT'S RESPONSIBILITY
12.1 Merchant warrants that in agreeing to the terms and conditions hereof, he is, or has the authority of, the person owning or entitled to the possession of the Goods and this bill of lading. Merchant further warrants that: (i) the particulars relating to the Goods as set out on the reverse hereof have been checked and that such particulars, and any other particulars furnished by or on behalf of Merchant are adequate and correct, and (ii) it has complied with all statutes, ordinances, regulations and requirements of whatsoever nature relative to the Goods, Containers or other packages, its/their documentation or in any other way relating thereto.
12.2 Merchant acknowledges that carriage of bullion, precious metals or minerals, diamonds, precious or semi-precious stones or coinage, artworks, antiques, jewellery or rare or precious artefacts, documents of value including but not limited to currency notes, bonds, bearer documents, negotiable instruments, bank drafts, checks, or payment orders, is subject to particulars furnished with the booking of the Goods and Carrier's written approval prior to shipment.
12.3 The party booking FCL shipments shall provide the VGM of each Container to the Carrier not later than the VGM-Cut-off-Date in a format pursuant to www.hamburgsud-line.com/howtovgm. Non-compliance herewith will bar the Carrier from loading the Container on the intended Vessel, in which case the Carrier shall be entitled to demurrage, detention and / or storage fees under the applicable Tariff. The booking party shall also be liable to the Carrier for any costs, damages and fees resulting from such non-compliance. Same applies to the shipper and the consignee named overleaf to the extent they are liable under the applicable law.
12.4 When a Container is stuffed by or on behalf of Merchant, such Container shall be deemed shipped as "Shipper's weight, load, stow, count and seal" and Carrier shall not be liable for loss of or damage to the Goods caused by the: (i) manner in which Container has been stuffed; (ii) unsuitability of Goods for Carriage in Containers, or (iii) Merchant's failure to seal the Container at the commencement of Carriage. Merchant agrees Carrier has no reasonable means of checking quantity, weight, condition, identity or existence of contents or manner in which Goods are stuffed, stowed and secured within Container or breakbulk cargo is packaged, or that same is accurate or proper.
12.5 When a Container is supplied by Carrier and has been stuffed by or on behalf of Merchant, Carrier shall not be liable for loss of or damage to the Goods caused by the unsuitability or defective condition of the Container, which would have been apparent upon reasonable inspection by Merchant at or prior to time Container was stuffed. It is the Merchant's obligation to set and/or check that the temperature controls on the container are at the required carrying temperature and to properly set the ventilation / gas valve (CO2/O2) settings.
12.6 In absence of a written request to the contrary, Carrier is not under an obligation to provide a Container of any particular type or quality.
12.7 When any Container is owned or leased by Carrier, Merchant shall be liable, at tariff rates, for any delay beyond time allowed for the use of such Container, and for any loss, damage or expense incurred by Carrier as a result of failure to return the Container to Carrier in sound condition and state of cleanliness as when received, even if a condition caused by Goods does not then manifest itself and/or results in loss, damage or expense at a subsequent time. Payment therefor is due upon presentation of written cost estimates.
12.8 Carrier is committed to the concept of supply chain security. Merchant ensures the sealing of all packed Containers immediately after stuffing is completed and before placing them at Carrier's disposal for all destinations. Only high security seals must be used. All seals must meet the specifications for high security seals issued by the International Organization for Standardization under ISO/PAS 17712 and any subsequent amendment or new definition thereof.
12.9 When a Container is supplied by Merchant, Merchant warrants that: (i) the Container complies with CSC, ISO standards and all applicable rules and regulations established by IMO or other competent authorities or bodies, and (ii) the Container(s) meet or exceed applicable stacking weight and racking test load minimums.
12.10 Merchant shall be liable for and shall indemnify, defend and hold Carrier harmless against all claims, loss, liability, penalties, damage, delay, fines, attorney fees, costs, and/or expenses arising from any failure of Merchant to comply with the above-mentioned obligations or otherwise provided in this bill of lading or in any way related to the Goods or Container or which results from the acts or omissions of Merchant, its agents or servants or third parties for whom Merchant, its agents or servants are responsible.

## 13. DANGEROUS OR HAZARDOUS GOODS
13.1 No Goods which are or may become dangerous, hazardous, flammable, explosive, noxious or damaging (including radioactive material), or which are or may become liable to damage any person or property whatsoever, regardless of whether such Goods are listed in any international or national code, convention, listing or table, shall be tendered to Carrier for Carriage without its express consent in writing and without distinctly marking the Goods and the Container or other covering on the outside so as to indicate the nature and character of any such Goods and so as to comply with any applicable laws, regulations or requirements. If any such Goods are delivered to Carrier without such written consent and marking, or if in the opinion of Carrier the Goods are or are liable to become of a dangerous, hazardous, flammable, explosive, noxious or damaging nature, the same may at any time or place be unloaded, destroyed, disposed of, abandoned or rendered harmless without compensation to Merchant.
13.2 Merchant undertakes that such Goods are packed in a manner adequate to withstand the risk of Carriage having regard to their nature and in compliance with all laws, regulations or requirements which may be applicable to the Goods or Carriage including IMDG Code, ADR, RID, and CFR.
13.3 Merchant shall indemnify and defend Carrier against all claims, loss, liability, damage, delay, fines, attorney fees, costs, and/or expenses arising from or related to the Carriage of such Goods and/or breach of any of the warranties and obligations provided herein whether or not Merchant was aware of the nature of such Goods.

## 14. REEFER CONTAINERS
Containers with temperature- or atmosphere-controlled apparatus will not be furnished unless expressly contracted for in writing at time of booking and, when furnished, may entail increased Charges. In absence of an express request, it shall be conclusively presumed that use of a dry Container is appropriate for the Goods. Merchant must provide Carrier with desired set-temperature when delivering Containers to Carrier. Carrier shall not be responsible for: (i) the functioning of temperature- or atmosphere-controlled Containers not supplied by Carrier or related companies or (ii) the consequences of the Goods, when placed in any Container, being at a higher temperature than that required for the Carriage (hot stuffing) or (iii) the recording of temperatures in any form. The Carrier does not accept to comply with any governmental program or protocol.
Merchant acknowledges that temperature- or atmosphere-controlled Containers are not designed to freeze down cargo which has not been presented for stuffing at or below its designated carrying temperature or to monitor and control humidity levels, albeit a setting facility exists, in that humidity is influenced by many external factors and Carrier does not guarantee the maintenance of any intended level of humidity inside any Container.
Merchant acknowledges that Goods, which require refrigeration, ventilation or other specialized attention, were not verified by Carrier, when received, as being at the carrying temperature, humidity level or other condition designated by Merchant.

## 15. BOTH-TO-BLAME COLLISION CLAUSE
The Both-to-Blame Collision Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 16. GENERAL AVERAGE
16.1 General Average shall be adjusted, stated and settled according to York-Antwerp Rules 2016. Merchant shall give such cash deposit or other security as Carrier may deem sufficient to cover estimated General Average contribution of Goods before delivery as Carrier requires, or, if not so required, within 3 (three) months of delivery of Goods, whether or not at the time of delivery Merchant had notice of Carrier's lien. Carrier shall be under no obligation to exercise any lien for General Average contribution due from Merchant(s).
16.2 Cargo's contribution in General Average shall be paid even when such Average is result of fault, neglect or error of the Master, pilot, officers or crew. The New Jason Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

## 17. LAW AND JURISDICTION
Unless otherwise provided herein, any claim, dispute, suit or proceeding arising under or relating to this bill of lading shall be governed by the laws of Germany and subject to the exclusive jurisdiction of the courts of the City of Hamburg, except that at Carrier's sole option, they may commence proceedings against Merchant at any court or tribunal having jurisdiction.

## 18. NON-WAIVER AND SEVERABILITY
18.1 No servant or agent of Carrier shall have the power to waive or vary any of the terms hereof unless such waiver or variation is in writing and is specifically authorized or ratified in writing by an officer or director of Carrier having actual authority to bind Carrier to such waiver or variation.
18.2 Nothing herein shall operate to deprive Carrier of any statutory protection or defense, immunity, exemption, limitation of or exoneration from liability contained in applicable laws.
18.3 The terms and conditions of this bill of lading (including those of the applicable tariff(s)) are separable, and if any part or term is held invalid, such holding shall not affect the validity or enforceability of any other part or term hereof.

HS BL 01-19 - 742383

# Bill of Lading
## Multimodal Transport or Port-to-Port Shipment


www.hamburgsud-line.com

**Shipper**
JBS SA/SEARA ALIMENTOS LTDA
AV. PALUDO, 155 - INDUSTRIAL,
SEARA - SC, 89770-000, BRAZIL.

C.N.P.J. 02.916.265-0001-60

**B/L No. (also to be used as payment ref.):** SUDU60ITJ030163F
**Booking No.:** 0ITJ030163

**Export References**
0627255E20-A
SD.:
Vessel IMO No.: 9526966
INTBL:  TJ60638H     CNPJ-SH: 02916265000160

**Consignee** ("Not negotiable unless consigned to order")
TO ORDER.

**Notify Party** (See cl. 9)
ZHONGSHAN CITY BENTENGHE WINE
TRADING CO., LTD.
NO.6, WEST 1 STREET, TIANWANG
ROAD, SHAGANG VILLAGE, EAST
DISTRICT, ZHONGSHAN CITY,
GUANGDONG, CHINA.

**Forwarding Agent-References**

**Point and country of origin**

**Domestic Routing Instructions / Also Notify / Agent at Port of Discharge**

**Place of Receipt***

**Pre-carriage by***

**Port of Loading:** ITAJAI, BRITJ
**Ocean Vessel:** MAERSK LEON  **Voyage:** 42E
**Originals to be released at:** ITAJAI, BRITJ
**Freight payable at:** ITAJAI, BRITJ(PAID)

**Port of Trans-Shipment*:** SHANGHAI PORT, CHINA
**Place of Delivery*:** NANSHA NEW PORT, CHINA
**Mode Load Area**
**Mode Disch. Area**

### PARTICULARS FURNISHED BY SHIPPER

| Marks & Nos. / Cont./Seal Nos. / No. of Pkgs. / Description of Goods | Gross Weight | Measurement |
|---|---|---|

1 - 40' CONTAINER   - SHIPPER'S LOAD, STOW, COUNT, WEIGHT AND SEAL

```
MNBU3473021        1350 CARTONS OF GRADE A FROZEN CHICKEN MID JOINT  28994.620 KGS  40.000CBM
Seal-Numbers            WINGS 35G-45G PER PIECE, SEARA BRAND
MLBR0733244             PACKED IN 20 KGS STANDARD CARTONS
00028924/490            -N.C.M.:0207.14.00
SEARA/HALAL             NW 27110.400 kgs / GW 28994.620 kgs

Tare: 4360 KG           Cargo stowed in a refrigerated container
Size:40' Type:RH        set at the shipper's requested carrying
Cnt.Ld.:FCLFCL          req. temperature of: -22.00 C.
AS PER SHIPPER.

                    ----------------------------------------------------------------
                        1350 CARTONS                                28994.620 KGS 40.000 CBM
                    ----------------------------------------------------------------

FREIGHT AS PER AGREEMENT          FREIGHT PREPAID BY SHIPPER
RUC:9BR018387231000000000000000627255E20
/

                        Additional export references:
                        9BR018387231000000000000000627255E20

Agreement No.(s): RSEC9000160-01078

Page: 1 of 1
```

**COPY not negotiable**

| Tariff Item No. | Total No. of Pkgs. | Declared value (See clause 4.2.(b)) | No. orig. B/L | |
|---|---|---|---|---|
| | | | 3 | SHIPPED ON BOARD: 17.10.20 |

RECEIVED for shipment as specified above in apparent good order and condition unless otherwise stated. The Goods to be delivered at above mentioned Port of Discharge or Place of Delivery, whichever applies, SUBJECT TO Terms and Conditions contained on reverse side hereof, to which Merchant agrees by accepting this Bill of Lading.
IN WITNESS WHEREOF the number of original Bills of Lading stated on this side next to this clause have been signed, one of which being accomplished, the others to stand void, unless compulsorily applicable law provides otherwise.
*Applicable only when used for MULTIMODAL TRANSPORTATION.



**Place and date of issue**
ITAJAI SC BR
19.10.20

**Signed as Agent for HAMBURG SÜD**

**as CARRIER**  Alianca Navegacao e Logistica Ltda.

# TERMS AND CONDITIONS FOR CARRIAGE

**1. DEFINITIONS**

"Carrier" means Hamburg Südamerikanische Dampfschiffahrts-Gesellschaft A/S & Co KG, Willy-Brandt-Straße 59-65, 20457 Hamburg, Germany,Commercial Register: Amtsgericht Hamburg HRA 58448 (hereinafter "Hamburg Süd"), General Partner: Hamburg Süd A/S, Copenhagen (Denmark), Centrale Virksomhedsregister (CVR) No. 32345794. Executive Board: Søren Skou (CEO), Board of Directors: Jim Hagemann Snabe (Chairman), Executive Board of Hamburg Südamerikanische Dampfschiffahrts-Gesellschaft A/S & Co KG: Dr. Arnt Vespermann (CEO), Frank Smet (CCO), Jakob Wegge-Larsen (CFO).

"Carriage" means the whole or any part of the operations and services undertaken by Carrier in respect of the Goods covered by this bill of lading whether by water, land, or air.

"Charges" includes freight, deadfreight, demurrage and all expenses and money obligations incurred or payable in accordance with the applicable tariff or this bill of lading.

"COGSA" means the U.S. Carriage of Goods by Sea Act.

"Container" includes any open or closed container, van, trailer, flatbed, flatrack, transportable tank or any similar receptacle whatsoever used to consolidate the Goods and any connected equipment.

"Goods" means the cargo, in whole or part, received from the shipper and any Container not supplied by or on behalf of Carrier.

"Hague Rules" means the International Convention for the Unification of Certain Rules relating to Bills of Lading of 1924 including the Visby Amendment and the 1979 Protocol.

"Merchant" includes the booking party, shipper, consignee, receiver, holder of this bill of lading, or any person owning or entitled to possession of the Goods or of this bill of lading, and the servants and agents and principals of any of these, all of whom shall be jointly and severally liable to Carrier for the payment of all Charges, and for the performance of the obligations of any of them under this bill of lading.

"Subcontractor" includes the owners, managers, charterers, slot or space charterers, and operators of any Vessel (other than Carrier), underlying or substitute carriers; stevedores and terminal operators; and any direct or indirect servant, agent, or subcontractor (including their own subcontractors), or any other party employed by or on behalf of Carrier, or whose services or equipment have been used to perform this contract whether in contractual privity with Carrier or not.

"Vessel" means the ocean vessel named on the face side hereof, and any substitute vessel, feedership, barge or other means of conveyance by water used for the Carriage.

"VGM" means the verified gross mass obtained by a method prescribed by SOLAS and any laws in force at the port of loading

**2. CARRIER'S TARIFF(S)**

All terms and conditions of Carrier's applicable tariff(s), including but not limited to those pertaining to demurrage and detention are incorporated herein. Copies of the tariff(s) or relevant provisions thereof are obtainable from Carrier or the applicable regulatory body on request. In the event of a conflict between the terms and conditions of such tariff(s) and this bill of lading, the bill of lading shall prevail.

**3. CHARGES**

**4. CARRIER'S RESPONSIBILITY**

**5. SUBCONTRACTING**

**6. METHODS AND ROUTES OF CARRIAGE**

**7. MATTERS AFFECTING PERFORMANCE**

**8. DECK CARGO**

**9. DELIVERY**

**10. NOTICE OF CLAIM AND TIME TO SUE**

**11. CARRIER'S LIEN**

**12. MERCHANT'S RESPONSIBILITY**

**13. DANGEROUS OR HAZARDOUS GOODS**

**14. REEFER CONTAINERS**

**15. BOTH-TO-BLAME COLLISION CLAUSE**

The Both-to-Blame Collision Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

**16. GENERAL AVERAGE**

16.1 General Average shall be adjusted, stated and settled according to York-Antwerp Rules 2016. Merchant shall give such cash deposit or other security as Carrier may deem sufficient to cover estimated General Average contribution of Goods before delivery as Carrier requires, or, if not so required, within 3 (three) months of delivery of Goods, whether or not at the time of delivery Merchant had notice of Carrier's lien. Carrier shall be under no obligation to exercise any lien for General Average contribution due from Merchant(s).

16.2 Cargo's contribution in General Average shall be paid even when such Average is result of fault, neglect or error of the Master, pilot, officers or crew. The New Jason Clause published by the Baltic and International Maritime Council and obtainable from Carrier or its agents upon request is hereby incorporated herein.

**17. LAW AND JURISDICTION**

Unless otherwise provided herein, any claim, dispute, suit or proceeding arising under or relating to this bill of lading shall be governed by the laws of Germany and subject to the exclusive jurisdiction of the courts of the City of Hamburg, except that at Carrier's sole option, Carrier may commence proceedings against Merchant at any court or tribunal having jurisdiction.

**18. NON-WAIVER AND SEVERABILITY**

18.1 No servant or agent of Carrier shall have the power to waive or vary any of the terms hereof unless such waiver or variation is in writing and is specifically authorized or ratified in writing by an officer or director of Carrier having actual authority to bind Carrier to such waiver or variation.

18.2 Nothing herein shall operate to deprive Carrier of any statutory protection or defense, immunity, exemption, limitation of or exoneration from liability contained in applicable laws.

18.3 The terms and conditions of this bill of lading (including those of the applicable tariff(s)) are separable, and if any part or term is held invalid, such holding shall not affect the validity or enforceability of any other part or term hereof.

HS BL 01-19 - 742383